PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3798
_____

UNITED STATES OF AMERICA

v.

ANTHONY DOUGLAS ELONIS,
                                        Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Criminal No. 5-11-cr-00013-001
(Honorable Lawrence F. Stengel)
_____

Argued: June 14, 2013

Before:  SCIRICA, HARDIMAN, and ALDISERT, *Circuit Judges*

(Filed:  September 19, 2013 )

Ronald H. Levine, Esq. [ARGUED]
Abraham J. Rein, Esq.
Post & Schell

1600 John F. Kennedy Boulevard
Four Penn Center, 14th Floor
Philadelphia, PA  19103

   *Counsel for Appellant*

Sherri A. Stephan, Esq.
Office of United States Attorney
504 West Hamilton Street
Suite 3701
Allentown, PA  18101


Robert A. Zauzmer, Esq. [ARGUED]
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA  19106

   *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

SCIRICA, *Circuit Judge*

     This case presents the question whether the true threats exception to speech protection under the First Amendment requires a jury to find the defendant subjectively intended his statements to be understood as threats.  Anthony Elonis challenges his jury conviction under 18 U.S.C. § 875(c),

arguing he did not subjectively intend his Facebook posts to be threatening. In *United States v. Kosma*, 951 F.2d 549, 557 (3d Cir. 1991) we held a statement is a true threat when a reasonable speaker would foresee the statement would be interpreted as a threat. We consider whether the Supreme Court decision in *Virginia v. Black*, 538 U.S. 343, 359 (2003), overturns this standard by requiring a subjective intent to threaten.

## I.

In May 2010, Elonis's wife of seven years moved out of their home with their two young children. Following this separation, Elonis began experiencing trouble at work. Elonis worked at Dorney Park & Wildwater Kingdom amusement park as an operations supervisor and a communications technician. After his wife left, supervisors observed Elonis with his head down on his desk crying, and he was sent home on several occasions because he was too upset to work.

One of the employees Elonis supervised, Amber Morrissey, made five sexual harassment reports against him. According to Morrissey, Elonis came into the office where she was working alone late at night, and began to undress in front of her. She left the building after he removed his shirt. Morrissey also reported another incident where Elonis made a minor female employee uncomfortable when he placed himself close to her and told her to stick out her tongue. On October 17, 2010 Elonis posted on his Facebook page a photograph taken for the Dorney Park Halloween Haunt. The photograph showed Elonis in costume holding a knife to Morrissey's neck. Elonis added the caption "I wish" under the photograph. Elonis's supervisor saw the Facebook

3

posting and fired Elonis that same day.

Two days after he was fired, Elonis began posting violent statements on his Facebook page. One post regarding Dorney Park stated:

> Moles. Didn't I tell ya'll I had several? Ya'll saying I had access to keys for the fucking gates, that I have sinister plans for all my friends and must have taken home a couple. Ya'll think it's too dark and foggy to secure your facility from a man as mad as me. You see, even without a paycheck I'm still the main attraction. Whoever thought the Halloween haunt could be so fucking scary?

Elonis also began posting statements about his estranged wife, Tara Elonis, including the following: "If I only knew then what I know now, I would have smothered your ass with a pillow, dumped your body in the back seat, dropped you off in Toad Creek, and made it look like a rape and murder." Several of the posts about Tara Elonis were in response to her sister's status updates on Facebook. For example, Tara Elonis's sister posted her status update as: "Halloween costume shopping with my niece and nephew should be interesting." Elonis commented on this status update, writing, "Tell [their son] he should dress up as matricide for Halloween. I don't know what his costume would entail though. Maybe [Tara Elonis's] head on a stick?" Elonis also posted in October 2010:

> There's one way to love you but a thousand

4

ways to kill you.  I'm not going to rest until
your body is a mess, soaked in blood and dying
from all the little cuts.  Hurry up and die, bitch,
so I can bust this nut all over your corpse from
atop your shallow grave.  I used to be a nice guy
but then you became a slut.  Guess it's not your
fault you liked your daddy raped you.
So hurry up and die, bitch, so I can forgive you.

Based on these statements a state court issued Tara Elonis a Protection From Abuse order against Elonis on November 4, 2010.  Following the issuance of the state court Protection From Abuse order, Elonis posted several statements on Facebook expressing intent to harm his wife. On November 7 he wrote:[1]

Did you know that it's illegal for me to say I
want to kill my wife?
It's illegal.
It's indirect criminal contempt.
It's one of the only sentences that I'm not
allowed to say.
Now it was okay for me to say it right then
because I was just telling you that it's illegal for
me to say I want to kill my wife.
I'm not actually saying it.
I'm just letting you know that it's illegal for me
to say that.
It's kind of like a public service.
I'm letting you know so that you don't
accidently go out and say something like that

---

[1] This statement was the basis of Count 2 of the indictment.

Um, what's interesting is that it's very illegal to say I really, really think someone out there should kill my wife.
That's illegal.
Very, very illegal.
But not illegal to say with a mortar launcher.
Because that's its own sentence.
It's an incomplete sentence but it may have nothing to do with the sentence before that.
So that's perfectly fine.
Perfectly legal.
I also found out that it's incredibly illegal, extremely illegal, to go on Facebook and say something like the best place to fire a mortar launcher at her house would be from the cornfield behind it because of easy access to a getaway road and you'd have a clear line of sight through the sun room.
Insanely illegal.
Ridiculously, wrecklessly, insanely illegal.
Yet even more illegal to show an illustrated diagram.

```
===[ __ ] =====house
: : : : : : ^ : : : : : : : : : : :cornfield
: : : : : : : : : : : : : : : : : : :
: : : : : : : : : : : : : : : : : : :
: : : : : : : : : : : : : : : : : : :
#####################getaway road
```

Insanely illegal.
Ridiculously, horribly felonious.
Cause they will come to my house in the middle of the night and they will lock me up.
Extremely against the law.

Uh, one thing that is technically legal to say is that we have a group that meets Fridays at my parent's house and the password is sic simper tyrannis.

Tara Elonis testified at trial that she took these statements seriously, saying, "I felt like I was being stalked. I felt extremely afraid for mine and my children's and my families' lives." Trial Tr. 97, Oct. 19, 2011. Ms. Elonis further testified that Elonis rarely listened to rap music, and that she had never seen Elonis write rap lyrics during their seven years of marriage. She explained that the lyric form of the statements did not make her take the threats any less seriously.

On November 15 Elonis posted on his Facebook page:

Fold up your PFA and put it in your pocket
Is it thick enough to stop a bullet?
Try to enforce an Order
That was improperly granted in the first place
Me thinks the judge needs an education on true threat jurisprudence
And prison time will add zeroes to my settlement
Which you won't see a lick
Because you suck dog dick in front of children
****
And if worse comes to worse
I've got enough explosives
to take care of the state police and the sheriff's department
[link: Freedom of Speech, www.wikipedia.org]

7

This statement was the basis both of Count 2, threats to Elonis's wife, and Count 3, threats to local law enforcement. A post the following day on November 16 involving an elementary school was the basis of Count 4:

> That's it, I've had about enough
> I'm checking out and making a name for myself
> Enough elementary schools in a ten mile radius
> to initiate the most heinous school shooting ever imagined
> And hell hath no fury like a crazy man in a kindergarten class
> The only question is . . . which one?

By this point FBI Agent Denise Stevens was monitoring Elonis's public Facebook postings, because Dorney Park contacted the FBI claiming Elonis had posted threats against Dorney Park and its employees on his Facebook page. After reading these and other Facebook posts by Elonis, Agent Stevens and another FBI agent went to Elonis's house to interview him. When the agents knocked on his door, Elonis's father answered and told the agents Elonis was sleeping. The agents waited several minutes until Elonis came to the door wearing a t-shirt, jeans, and no shoes. Elonis asked the agents if they were law enforcement and asked if he was free to go. After the agents identified themselves and told him he was free to go, Elonis went inside and closed the door. Later that day, Elonis posted the following on Facebook:

> You know your shit's ridiculous
> when you have the FBI knockin' at yo' door
> Little Agent Lady stood so close

Took all the strength I had not to turn the bitch ghost
Pull my knife, flick my wrist, and slit her throat
Leave her bleedin' from her jugular in the arms of her partner

[laughter]

So the next time you knock, you best be serving a warrant
And bring yo' SWAT and an explosives expert while you're at it
Cause little did y'all know, I was strapped wit' a bomb
Why do you think it took me so long to get dressed with no shoes on?
I was jus' waitin' for y'all to handcuff me and pat me down
Touch the detonator in my pocket and we're all goin'

[BOOM!]

These statements were the basis of Count 5 of the indictment. After she observed this post on Elonis's Facebook page, Agent Stevens contacted the U.S. Attorney's Office.

## II.

Elonis was arrested on December 8, 2010 and charged with transmitting in interstate commerce communications containing a threat to injure the person of another in violation of 18 U.S.C. § 875(c). The grand jury indicted Elonis on five

9

counts of making threatening communications: Count 1 threats to patrons and employees of Dorney Park & Wildwater Kingdom, Count 2 threats to his wife, Count 3 threats to employees of the Pennsylvania State Police and Berks County Sheriff's Department, Count 4 threats to a kindergarten class, and Count 5 threats to an FBI agent.

Elonis moved to dismiss the indictments against him, contending the Supreme Court held in *Virginia v. Black*, 538 U.S. 343, 347-48 (2003) that a subjective intent to threaten was required under the true threat exception to the First Amendment and that his statements were not threats but were protected speech. The District Court denied the motion to dismiss because even if the subjective intent standard applied, Elonis's intent and the attendant circumstances showing whether or not the statements were true threats were questions of fact for the jury. *United States v. Elonis*, No. 11-13, 2011 WL 5024284, at *3 (E.D. Pa. Oct. 20, 2011).

Elonis testified in his own defense at trial. A jury convicted Elonis on Counts 2 through 5, and the court sentenced him to 44 months' imprisonment followed by three years supervised release. Elonis filed a post-trial Motion to Dismiss Indictment with Prejudice under Rule 12(b)(3); and for New Trial under Rule 33(a), to Arrest Judgment under Rule 34(b) and/or Dismissal under Rule 29(c). The District Court denied the motion to dismiss the indictment, finding the indictment correctly tracked the language of the statute and stated the nature of the threat, the date of the threat and the victim of the threat. The court also stated the objective intent standard conformed with Third Circuit precedent. The court found the evidence supported the jury's finding that the statements in Count 3 and Count 5 were true threats. Finally,

the court held that the jury instruction presuming communications over the internet were transmitted through interstate commerce was supported by our precedent in *United States v. MacEwan*, 445 F.3d 237, 244 (3d Cir. 2006).

## III.[2]

### A.

Elonis was convicted under 18 U.S.C. § 875(c) for "transmit[ting] in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another . . . ." Elonis contends the trial court incorrectly instructed the jury on the standard of a true threat. The court gave the following jury instruction:

> A statement is a true threat when a defendant intentionally makes a statement in a context or

---

[2] The District Court had jurisdiction over this case under 18 U.S.C. § 3231. We exercise appellate jurisdiction under 28 U.S.C. § 1291. We review statutory interpretations and conclusions of law de novo. *Kosma*, 951 F.2d at 553. We exercise plenary review over the sufficiency of indictments. *United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007). "We apply a particularly deferential standard of review when deciding whether a jury verdict rests on legally sufficient evidence." *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998). Because Elonis failed to object to the jury instructions at trial, we review whether the jury instructions stated the correct legal standard for plain error. *United States v. Lee*, 612 F.3d 170, 191 (3d Cir. 2010).

> under such circumstances wherein a reasonable
> person would foresee that the statement would
> be interpreted by those to whom the maker
> communicates the statement as a serious
> expression of an
> intention to inflict bodily injury or take the life
> of an individual.

Trial Tr. 127, Oct. 20, 2011. Elonis posits that the Supreme Court decision in *Virginia v. Black* requires that a defendant subjectively intend to threaten, and overturns the reasonable speaker standard we articulated in *United States v. Kosma*, 951 F.3d 549, 557 (3d Cir. 1991).

> In *United States v. Kosma*, we held a true threat
> requires that
>
> the defendant intentionally make a statement,
> written or oral, in a context or under such
> circumstances wherein a reasonable person
> would foresee that the statement would be
> interpreted by those to whom the maker
> communicates the statement as a serious
> expression of an intention to inflict bodily harm
> upon or to take the life of the President, and that
> the statement not be the result of mistake,
> duress, or coercion.

*Id.* at 557 (quoting *Roy v. United States*, 416 F.2d 874, 877-78 (9th Cir. 1969) (emphasis omitted)). We rejected a subjective intent requirement that the defendant "intended at least to convey the impression that the threat was a serious one." *Id.* at 558 (quoting *Rogers v. United States*, 422 U.S.

12

35, 46 (1975) (Marshall, J., concurring)). We found "any subjective test potentially frustrates the purposes of section 871—to prevent not only actual threats on the President's life, but also the harmful consequences which flow from such threats." *Id.* (explaining "it would make prosecution of these threats significantly more difficult"). We have held the same "knowingly and willfully" mens rea *Kosma* analyzed under 18 U.S.C. § 871, threats against the president, applies to § 875(c). *United States v. Himelwright*, 42 F.3d 777, 782 (3d Cir. 1994) (holding "the government bore only the burden of proving that Himelwright acted knowingly and willfully when he placed the threatening telephone calls and that those calls were reasonably perceived as threatening bodily injury"). Since our precedent is clear, the question is whether the Supreme Court decision in *Virginia v. Black* overturned this standard.

The Supreme Court first articulated the true threats exception to speech protected under the First Amendment in *Watts v. United States*, 394 U.S. 705 (1969). During a rally opposing the Vietnam war, Watts told the crowd, "I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Id.* at 706 (internal quotation marks omitted). The Court reversed his conviction for making a threat against the president because the statement was "political hyperbole," rather than a true threat. *Id.* at 708. The Court articulated three factors supporting its finding: 1. the context was a political speech; 2. the statement was "expressly conditional"; and 3. "the reaction of the listeners" who "laughed after the statement was made." *Id.* at 707-08. The Court did not address the true threats exception again

13

until *Virginia v. Black* in 2003.[3]

In *Virginia v. Black* the Court considered a Virginia statute that banned burning a cross with the "intent of intimidating" and provided "[a]ny such burning of a cross shall be prima facie evidence of an intent to intimidate a person or group of persons." 538 U.S. at 348 (citation and internal quotation marks omitted). The Court reviewed three separate convictions of defendants under the statute and concluded that intimidating cross burning could be proscribed as a true threat under the First Amendment. *Id.* at 363. But the prima facie evidence provision violated due process, because it permitted a jury to convict whenever a defendant exercised his or her right to not put on a defense. *Id.* at 364-65.

The Court reviewed the historic and contextual meanings behind cross burning, and found it conveyed a political message, a cultural message, and a threatening message, depending on the circumstances. *Id.* at 354-57. The Court then described the true threat exception generally before analyzing the Virginia statute:

> "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. *See Watts v. United States*, *supra*, at 708 . . . ("political hyperbole"

---

[3] The Court did discuss the constitutional limits on banning "fighting words" in *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992).

is not a true threat); *R.A.V. v. City of St. Paul*, 505 U.S., at 388. . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." *Ibid.* Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death. Respondents do not contest that some cross burnings fit within this meaning of intimidating speech, and rightly so. As noted in Part II, *supra*, the history of cross burning in this country shows that cross burning is often intimidating, intended to create a pervasive fear in victims that they are a target of violence.

*Id.* at 359-60 (citation omitted). Elonis contends that this definition of true threats means that the speaker must both intend to communicate and intend for the language to threaten the victim.[4] But the Court did not have occasion to make

---

[4] Elonis also points to the passage "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Black*, 538 U.S. at 360. But this

15

such a sweeping holding, because the challenged Virginia statute already required a subjective intent to intimidate. We do not infer from the use of the term "intent" that the Court invalidated the objective intent standard the majority of circuits applied to true threats.[5] Instead, we read "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence" to mean that the speaker must intend to make the communication. It would require adding language the Court did not write to read the passage as "statements where the speaker means to communicate [and intends the statement to be understood as] a serious expression of an intent to commit an act of unlawful violence." *Id.* at 359. This is not what the Court wrote, and it is inconsistent with the logic animating the true threats exception.

The "prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.'" *Id.* at

_____

sentence explains when intimidation can be a true threat, and does not define when threatening language is a true threat.

[5] *See, e.g.*, *United States v. Whiffen*, 121 F.3d 18, 20-21 (1st Cir. 1997); *United States v. Francis*, 164 F.3d 120, 122 (2d Cir. 1999); *United States v. Darby*, 37 F.3d 1059, 1066 (4th Cir. 1994); *United States v. Myers*, 104 F.3d 76, 80-81 (5th Cir. 1997); *United States v. DeAndino*, 958 F.2d 146, 148 (6th Cir. 1992); *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990); *United States v. Manning*, 923 F.2d 83, 86 (8th Cir. 1991); *United States v. Hart*, 457 F.2d 1087, 1091 (10th Cir. 1972); *United States v. Callahan*, 702 F.2d 964, 965 (11th Cir. 1983); *Metz v. Dep't of Treasury*, 780 F.2d 1001, 1002 (Fed. Cir. 1986).

360 (quoting *R.A.V.*, 505 U.S. at 388). Limiting the definition of true threats to only those statements where the speaker subjectively intended to threaten would fail to protect individuals from "the fear of violence" and the "disruption that fear engenders," because it would protect speech that a reasonable speaker would understand to be threatening. *Id.*

Elonis further contends the unconstitutionality of the prima facie evidence provision in *Black* indicates a subjective intent to threaten is required. The Court found the fact that the defendant burned a cross could not be prima facie evidence of intent to intimidate. *Id.* at 364-65. The Court explained that while cross burning was often employed as intimidation or a threat of physical violence against others, it could also function as a symbol of solidarity for those within the white supremacist movement. *Id.* at 365-66. Less frequently, crosses had been burned outside of the white supremacist context, such as stage performances. *Id.* at 366. Since the burning of a cross could have a constitutionally-protected political message as well as a threatening message, the prima facie evidence provision failed to distinguish protected speech from unprotected threats. Furthermore, the prima facie evidence provision denied defendants the right to not put on a defense, since the prosecution did not have to produce any evidence of intent to intimidate, which was an element of the crime. *Id.* at 364-65.

We do not find that the unconstitutionality of Virginia's prima facie evidence provision means the true threats exception requires a subjective intent to threaten. First, the prima facie evidence provision did not allow the factfinder to consider the context to construe the meaning of the conduct, *id.* at 365-66, whereas the reasonable person

17

standard does encompass context to determine whether the statement was a serious expression of intent to inflict bodily harm. Second, cross-burning is conduct that may or may not convey a meaning, as opposed to the language in this case which has inherent meaning in addition to the meaning derived from context. Finally, the prima facie evidence provision violated the defendant's due process rights to not put on a defense, because the defendant could be convicted even when the prosecution had not proven all the elements of the crime. *Id.* That is not an issue here because the government had to prove that a reasonable person would foresee Elonis's statements would be understood as threats.

The majority of circuits that have considered this question have not found the Supreme Court decision in *Black* to require a subjective intent to threaten. *See United States v. White*, 670 F.3d 498, 508 (4th Cir. 2012) ("A careful reading of the requirements of § 875(c), together with the definition from *Black*, does not, in our opinion, lead to the conclusion that *Black* introduced a specific-intent-to-threaten requirement into § 875(c) . . . ."); *United States v. Jeffries*, 692 F.3d 473, 479 (6th Cir. 2012) ("[T]he position reads too much into *Black*."); *United States v. Mabie*, 663 F.3d 322, 332-33 (8th Cir. 2011), *cert. denied*, 133 S. Ct. 107 (2012) (noting the objective test had been applied many times after *Black*) [6]; *United States v. Nicklas*, 713 F.3d 435, 440 (8th Cir.

_____

[6] The Eighth Circuit cited the following cases applying an objective standard after the Supreme Court's decision in *Black*:

> *United States v. Beale*, 620 F.3d 856, 865 (8th Cir. 2010) . . . ; *United States v. Armel*, 585

18

2013) (quoting extensively from *Jeffries*, the court "concluded § 875(c) does not require the government to prove a defendant specifically intended his or her statements to be threatening").

The Fourth Circuit in *United States v. White* considered the same criminal statute, 18 U.S.C. § 875(c), and found the Court in *Black* "gave no indication it was redefining a general intent crime such as § 875(c) to be a specific intent crime." 670 F.3d at 509. The Fourth Circuit reasoned that *Black* had analyzed a statute that included a specific intent element, whereas § 875(c) had consistently been applied as a general intent statute. *Id.* at 508. The court further distinguished *Black* by noting the multiple meanings of cross-burning necessitated a finding of intent to distinguish protected speech from true threats. *Id.* at 511. The court in *White* found this same problem did not exist for threatening language because it has no First Amendment value. *Id.* Finally, the court found the general intent standard for § 875(c) offenses did not chill "statements of jest or political

> F.3d 182, 185 (4th Cir. 2009) (applying an objective test in a true threat analysis); *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 616–17 (5th Cir. 2004) ("[T]o lose the protection of the First Amendment and be lawfully punished, the threat must be intentionally or knowingly *communicated* to either the object of the threat or a third person."); *United States v. Zavrel*, 384 F.3d 130, 136 (3d Cir. 2004) (applying an objective test in a true threat analysis).

*Mabie*, 663 F.3d at 332.

19

hyperbole" because "any such statements will, under the objective test, always be protected by the consideration of the context and of how a reasonable recipient would understand the statement." *Id.* at 509.[7]

In *United States v. Jeffries* the Sixth Circuit agreed that *Black* does not require a subjective intent to threaten to convict under 18 U.S.C. § 875(c). 692 F.3d at 479. Because *Black* interpreted a statute that already had a subjective intent requirement, the Sixth Circuit found the Court was not presented with the question whether an objective intent standard is constitutional. *Id.* *Jeffries* also found that the Court's ruling on the prima facie evidence provision did not address the specific intent question because "the statute lacked any standard at all." *Id.* at 479-80. Like the Fourth Circuit in *White*, the Sixth Circuit explained that the prima facie evidence provision failed to distinguish between protected speech and threats by not allowing for consideration of any contextual factors. *Id.* at 480. In contrast, "[t]he reasonable-person standard winnows out protected speech because, instead of ignoring context, it forces jurors to examine the circumstances in which a statement is made." *Id.*

The Ninth Circuit took a different view, and found the true threats definition in *Black* requires the speaker both intend to communicate and "intend for his language to *threaten* the victim." *United States v. Cassel*, 408 F.3d 622, 631 (9th Cir. 2005). The Ninth Circuit reasoned that the unconstitutionality of the prima facie provision meant that the Court required a finding of intent to threaten for all speech

---

[7] The Fourth Circuit test focuses on the reasonable recipient, but our test asks whether a reasonable speaker would foresee the statement would be understood as a threat.

labeled as "true threats," and not just cross burning. *Id.* at 631-32 ("[T]he prima facie evidence provision rendered the statute facially unconstitutional because it effectively eliminated the intent requirement."). "We are therefore bound to conclude that speech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat." *Id.* at 633.[8]

Regardless of the state of the law in the Ninth Circuit, we find that *Black* does not alter our precedent. We agree with the Fourth Circuit that *Black* does not clearly overturn the objective test the majority of circuits applied to § 875(c). *Black* does not say that the true threats exception requires a subjective intent to threaten. Furthermore, our standard does require a finding of intent to communicate. The jury had to find Elonis "knowingly and willfully" transmitted a "communication containing . . . [a] threat to injure the person of another." 18 U.S.C. § 875(c). A threat is made "knowingly" as when it is "made intentionally and not [as] the result of mistake, coercion or duress." *Kosma*, 951 F.2d at 557 (quotation omitted). A threat is made willfully when "a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm." *Id.* (citation and emphasis omitted). This objective intent standard protects non-threatening speech

---

[8] Similarly, in *United States v. Bagdasarian* the Ninth Circuit wrote in dicta that, in light of *Black*, "[a] statement that the speaker does not intend as a threat is afforded constitutional protection and cannot be held criminal." 652 F.3d 1113, 1122 (9th Cir. 2011).

while addressing the harm caused by true threats. Accordingly, the *Kosma* objective intent standard applies to this case and the District Court did not err in instructing the jury.

**B.**

Elonis contends the indictment was insufficient because it did not quote the language of the allegedly threatening statements. An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment is sufficient when it "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007) (internal quotations omitted). We have found an indictment is sufficient "where it informs the defendant of the statute he is charged with violating, lists the elements of a violation under the statute, and specifies the time period during which the violations occurred." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 422 (2012).

In *Huet* we found an indictment for aiding and abetting a felon in possession of a firearm was sufficient because it alleged the previous felony conviction of the principal, the time period of the violation and the specific weapon involved, and alleged the defendant "knowingly aided and abetted Hall's possession of that firearm." *Id.* at 596. "No more was required to allow Huet to prepare her defense and invoke double jeopardy." *Id.*

22

The Eighth Circuit considered an indictment that did not include the verbatim contents of a letter, the date it was written, or the name of the author. *Keys v. United States*, 126 F.2d 181, 184-85 (8th Cir. 1942). The indictment for communicating a threat to injure with the intent to extort merely stated the letter threatened to harm the reputation of the victim with intent to extort. *Id.* at 182-83. Since the indictment summarized the contents of the letter, provided the date it was mailed and the name of the addressee, the Eighth Circuit found there could be no confusion as to the elements and subject of the crime. *Id.* at 185 ("The fact that the defendant upon reading the indictment recognized the letter referred to and made no objection to the description at the time indicates the want of merit in his present criticism.").

To find a violation of 18 U.S.C. § 875(c) a defendant must transmit in interstate or foreign commerce a communication containing a threat to injure or kidnap a person. 18 U.S.C. § 875(c). Here the indictment on Count 2 stated:

> On or about November 6, 2010, through on or about November 15, 2010, in Bethlehem, in the Eastern District of Pennsylvania, and elsewhere, defendant ANTHONY DOUGLAS ELONIS knowingly and willfully transmitted in interstate and foreign commerce, via a computer and the Internet, a communication to others, that is, a communication containing a threat to injure the person of another, specifically, a threat to injure and kill T.E., a person known to the grand jury.

23

> In violation of Title 18, United States Code,
> Section 875(c).

The indictment on the other counts was identical, but stated each date of the threat, the nature of the threat, and the subjects of the threat. Count 3 alleged "a threat to injure employees of the Pennsylvania State Police and the Berks County Sheriff's Department"; Count 4 alleged "a threat to injure a kindergarten class of elementary school children"; and Count 5 alleged "a threat to injure an agent of the Federal Bureau of Investigation." Elonis contends the indictment was deficient because they did not include the allegedly threatening statements.

The indictment was sufficient because the counts describe the elements of the violation, the nature of the threat, the subject of the threat, and the time period of the alleged violation. For example, Count Four alleged defendant communicated over the internet on November 16, 2010 "a threat to injure a kindergarten class." If Elonis had already been charged with this statement, the indictment provided enough information to challenge a subsequent prosecution. Based on the indictment, defendant was notified he needed to dispute that the statement was a threat, that he communicated the statement, and that he transmitted the statement through interstate commerce. Moreover, like the defendant in *Keys*, Elonis was able to identify which internet communications the indictment described, since he did not raise the issue until after trial.[9]

---

[9] Elonis did challenge the sufficiency of the indictment prior to trial, but only on constitutional grounds. The indictment did not include a subjective intent to threaten.

24

## C.

Elonis contends there was insufficient evidence to convict on Counts 3 and 5 of the indictment because the statements on which they were based were not threats. "A claim of insufficiency of evidence places a very heavy burden on the appellant." *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted).

## 1.

Elonis contends Count 3 was based on a conditional statement, which he asserts cannot be a true threat. In *Watts* the Supreme Court found the conditional nature of defendant's statement to be one of the three factors demonstrating it was not a true threat. *Watts*, 394 U.S. at 708 ("Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise."). Elonis posted the following on his Facebook page:

> Fold up your PFA and put it in your pocket
> Is it thick enough to stop a bullet?
> Try to enforce an Order
> That was improperly granted in the first place
> Me thinks the judge needs an education on true
> threat jurisprudence

25

And prison time will add zeroes to my
settlement
Which you won't see a lick
Because you suck dog dick in front of children
****
And if worse comes to worse
I've got enough explosives
to take care of the state police and the sheriff's
department
[link: Freedom of Speech, www.wikipedia.org]

We considered the impact of conditional statements on the true threat analysis in *Kosma*, 951 F.2d at 554. We found that *Watts* did not hold conditional statements can never be true threats. *Id.* at 554 n.8 ("Even if Kosma's threats were truly conditional, they could still be considered true threats."). We explained the conditional statements in *Watts* "were dependent on the defendant's induction into the armed forces—a condition which the defendant stated would never happen." *Id.* at 554. Because the defendant's threats in *Kosma* stated a precise time and place for carrying out the alleged threats, they were true threats. *Id.*

Here the District Court found that a reasonable jury could find the statement to be a true threat. *United States v. Elonis*, 897 F. Supp. 2d 335, 346 (E.D. Pa. 2012). Unlike in *Watts*, Elonis did not vow the condition precedent would never occur. However, this case is also unlike *Kosma*, where the statement included a particular time and place. Elonis's statement only conveys a vague timeline or condition. But, taken as a whole, a jury could have found defendant was threatening to use explosives on officers who "[t]ry to enforce an Order" of protection that was granted to his wife. Since

26

there is no rule that a conditional statement cannot be a true threat—the words and context can demonstrate whether the statement was a serious expression of intent to harm—and we give substantial deference to a jury's verdict, there was not insufficient evidence for the jury to find the statement was a threat.

## 2.

Defendant contends that the statement on which Count 5 is based is a description of past conduct, not a future intent to harm:

> You know your shit's ridiculous
> when you have the FBI knockin' at yo' door
> Little Agent Lady stood so close
> Took all the strength I had not to turn the bitch ghost
> Pull my knife, flick my wrist, and slit her throat
> Leave her bleedin' from her jugular in the arms of her partner
>
> [laughter]
>
> So the next time you knock, you best be serving a warrant
> And bring yo' SWAT and an explosives expert while you're at it
> Cause little did y'all know, I was strapped wit' a bomb
> Why do you think it took me so long to get dressed with no shoes on?

I was jus' waitin' for y'all to handcuff me and
pat me down
Touch the detonator in my pocket and we're all
goin'

[BOOM!]

A threat under § 875(c) is a communication "expressing an intent to inflict injury in the present or future." *United States v. Stock*, No. 12-2914, slip op. at 13 (3d Cir. Aug. 26, 2013). It was possible for a reasonable jury to conclude that the statement "the next time you knock, best be serving a warrant [a]nd bring yo' SWAT and an explosives expert" coupled with the past reference to a bomb was a threat to use explosives against the agents "the next time." Indeed, the phrase "the next time" refers to the future, not a past event. Accordingly, a reasonable jury could have found the statement was a true threat.

### D.

Elonis contends the jury instruction stating communications that travel over the internet necessarily travel in interstate commerce violated his due process rights because the government was required to prove interstate transmission as an element of the crime. The District Court instructed the jury: "Because of the interstate nature of the Internet, if you find beyond a reasonable doubt that the defendant used the Internet in communicating a threat, then that communication traveled in interstate commerce." Trial Tr. 126, Oct. 11, 2011.

In *United States v. MacEwan* we explained the difference between interstate transmission and interstate

28

commerce.  445 F.3d 237, 243-44 (3d Cir. 2006).  The defendant in *MacEwan* contended the government failed to prove he received child pornography through interstate commerce because a Comcast witness testified it was impossible to know whether a particular transmission traveled through computer servers located entirely within Pennsylvania, or to any other server in the United States.  *Id.* at 241-42.  "[W]e conclude[d] that because of the very interstate nature of the Internet, once a user submits a connection request to a website server or an image is transmitted from the website server back to [the] user, the data has traveled in interstate commerce."  *Id.* at 244.  "Having concluded that the Internet is an instrumentality and channel of interstate commerce . . . .  [i]t is sufficient that MacEwan downloaded those images from the Internet, a system that is inexorably intertwined with interstate commerce."  *Id.* at 245.

Elonis distinguishes *MacEwan* by stating that in that case the government presented evidence on how the internet worked.  But the government's evidence in *MacEwan* did not show that any one of the defendant's internet transmissions traveled outside of Pennsylvania.[10]  We found that fact to be irrelevant to the question of interstate commerce because submitting data on the internet necessarily means the data travels in interstate commerce.  *Id.* at 241.  Instead, we held

---

[10] Notably, the government did present testimony on how Facebook works.  A computer forensic expert, Michael Moore, testified about privacy settings and that when a Facebook account is made public the postings can be seen by "whoever has access to it through the internet throughout the world."  Trial Tr. 15-17, Oct. 17, 2011.

29

"[i]t is sufficient that [the defendant] downloaded those images from the Internet." *Id*. at 245. Based on our conclusion that proving internet transmission alone is sufficient to prove transmission through interstate commerce, the District Court did not err in instructing the jury.

## IV.

For the foregoing reasons we will uphold Elonis's convictions under 18 U.S.C. § 875(c).