Justice ALITO, concurring in part and dissenting in part.
In Marbury v. Madison,1 Cranch 137, 177, 2 L.Ed. 60 (1803), the Court famously proclaimed: "It is emphatically the province and duty of the judicial department to say what the law is." Today, the Court announces: It is emphatically the prerogative of this Court to say only what the law is not.
The Court's disposition of this case is certain to cause confusion and serious problems. Attorneys and judges need to know which mental state is required for conviction under 18 U.S.C. § 875(c), an important criminal statute. This case squarely presents that issue, but the Court provides only a partial answer. The Court holds that the jury instructions in this case were defective because they required only negligence in conveying a threat. But the *2014 Court refuses to explain what type of intent was necessary. Did the jury need to find that Elonis had the purposeof conveying a true threat? Was it enough if he knewthat his words conveyed such a threat? Would recklessnesssuffice? The Court declines to say. Attorneys and judges are left to guess.
This will have regrettable consequences. While this Court has the luxury of choosing its docket, lower courts and juries are not so fortunate. They must actually decide cases, and this means applying a standard. If purpose or knowledge is needed and a district court instructs the jury that recklessness suffices, a defendant may be wrongly convicted. On the other hand, if recklessness is enough, and the jury is told that conviction requires proof of more, a guilty defendant may go free. We granted review in this case to resolve a disagreement among the Circuits. But the Court has compounded-not clarified-the confusion.
There is no justification for the Court's refusal to provide an answer. The Court says that "[n]either Elonis nor the Government has briefed or argued" the question whether recklessness is sufficient. Ante,at 2012 - 2013. But in fact both parties addressed that issue. Elonis argued that recklessness is not enough, and the Government argued that it more than suffices. If the Court thinks that we cannot decide the recklessness question without additional help from the parties, we can order further briefing and argument. In my view, however, we are capable of deciding the recklessness issue, and we should resolve that question now.
I
Section 875(c)provides in relevant part:
"Whoever transmits in interstate or foreign commerce any communication containing ... any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both."
Thus, conviction under this provision requires proof that: (1) the defendant transmitted something, (2) the thing transmitted was a threat to injure the person of another, and (3) the transmission was in interstate or foreign commerce.
At issue in this case is the mens rearequired with respect to the second element-that the thing transmitted was a threat to injure the person of another. This Court has not defined the meaning of the term "threat" in § 875(c), but in construing the same term in a related statute, the Court distinguished a "true 'threat' " from facetious or hyperbolic remarks. Watts v. United States,394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969)(per curiam). In my view, the term "threat" in § 875(c)can fairly be defined as a statement that is reasonably interpreted as "an expression of an intention to inflict evil, injury, or damage on another." Webster's Third New International Dictionary 2382 (1976). Conviction under § 875(c)demands proof that the defendant's transmission was in fact a threat, i.e.,that it is reasonable to interpret the transmission as an expression of an intent to harm another. In addition, it must be shown that the defendant was at least reckless as to whether the transmission met that requirement.
Why is recklessness enough? My analysis of the mens reaissue follows the same track as the Court's, as far as it goes. I agree with the Court that we should presume that criminal statutes require some sort of mens reafor conviction. See ante,at 2008 - 2011. To be sure, this presumption marks a departure from the way in which we generally interpret statutes. We "ordinarily resist reading words or elements into a statute that do not appear on *2015 its face." Bates v. United States,522 U.S. 23, 29, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997). But this step is justified by a well-established pattern in our criminal laws. "For several centuries (at least since 1600) the different common law crimes have been so defined as to require, for guilt, that the defendant's acts or omissions be accompanied by one or more of the various types of fault (intention, knowledge, recklessness or-more rarely-negligence)." 1 W. LaFave, Substantive Criminal Law § 5.5, p. 381 (2003). Based on these "background rules of the common law, in which the requirement of some mens reafor a crime is firmly embedded," we require "some indication of congressional intent, express or implied, ... to dispense with mens reaas an element of a crime." Staples v. United States,511 U.S. 600, 605-606, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994).
For a similar reason, I agree with the Court that we should presume that an offense like that created by § 875(c)requires more than negligence with respect to a critical element like the one at issue here. See ante,at 2010 - 2012. As the Court states, "[w]hen interpreting federal criminal statutes that are silent on the required mental state, we read into the statute 'only that mens reawhich is necessary to separate wrongful conduct from "otherwise innocent conduct." ' " Ante,at 2010 (quoting Carter v. United States,530 U.S. 255, 269, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000)). Whether negligence is morally culpable is an interesting philosophical question, but the answer is at least sufficiently debatable to justify the presumption that a serious offense against the person that lacks any clear common-law counterpart should be presumed to require more.
Once we have passed negligence, however, no further presumptions are defensible. In the hierarchy of mental states that may be required as a condition for criminal liability, the mens reajust above negligence is recklessness. Negligence requires only that the defendant "should [have] be [en] aware of a substantial and unjustifiable risk," ALI, Model Penal Code § 2.02(2)(d), p. 226 (1985), while recklessness exists "when a person disregards a risk of harm of which he is aware," Farmer v. Brennan,511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); Model Penal Code § 2.02(2)(c). And when Congress does not specify a mens reain a criminal statute, we have no justification for inferring that anything more than recklessness is needed. It is quite unusual for us to interpret a statute to contain a requirement that is nowhere set out in the text. Once we have reached recklessness, we have gone as far as we can without stepping over the line that separates interpretation from amendment.
There can be no real dispute that recklessness regarding a risk of serious harm is wrongful conduct. In a wide variety of contexts, we have described reckless conduct as morally culpable. See, e.g., Farmer, supra,at 835-836, 114 S.Ct. 1970(deliberate indifference to an inmate's harm);Garrison v. Louisiana,379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)(criminal libel); New York Times Co. v. Sullivan,376 U.S. 254, 279-280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)(civil libel). Indeed, this Court has held that "reckless disregard for human life" may justify the death penalty.Tison v. Arizona,481 U.S. 137, 157, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). Someone who acts recklessly with respect to conveying a threat necessarily grasps that he is not engaged in innocent conduct. He is not merely careless. He is aware that others could regard his statements as a threat, but he delivers them anyway.
*2016 Accordingly, I would hold that a defendant may be convicted under § 875(c)if he or she consciously disregards the risk that the communication transmitted will be interpreted as a true threat. Nothing in the Court's non-committal opinion prevents lower courts from adopting that standard.
II
There remains the question whether interpreting § 875(c)to require no more than recklessness with respect to the element at issue here would violate the First Amendment. Elonis contends that it would. I would reject that argument.
It is settled that the Constitution does not protect true threats. See Virginia v. Black,538 U.S. 343, 359-360, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003); R.A.V. v. St. Paul, 505 U.S. 377, 388, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992);Watts,394 U.S., at 707-708, 89 S.Ct. 1399. And there are good reasons for that rule: True threats inflict great harm and have little if any social value. A threat may cause serious emotional stress for the person threatened and those who care about that person, and a threat may lead to a violent confrontation. It is true that a communication containing a threat may include other statements that have value and are entitled to protection. But that does not justify constitutional protection for the threat itself.
Elonis argues that the First Amendment protects a threat if the person making the statement does not actually intend to cause harm. In his view, if a threat is made for a " 'therapeutic' " purpose, "to 'deal with the pain' ... of a wrenching event," or for "cathartic" reasons, the threat is protected. Brief for Petitioner 52-53. But whether or not the person making a threat intends to cause harm, the damage is the same. And the fact that making a threat may have a therapeutic or cathartic effect for the speaker is not sufficient to justify constitutional protection. Some people may experience a therapeutic or cathartic benefit only if they know that their words will cause harm or only if they actually plan to carry out the threat, but surely the First Amendment does not protect them.
Elonis also claims his threats were constitutionally protected works of art. Words like his, he contends, are shielded by the First Amendment because they are similar to words uttered by rappers and singers in public performances and recordings. To make this point, his brief includes a lengthy excerpt from the lyrics of a rap song in which a very well-compensated rapper imagines killing his ex-wife and dumping her body in a lake. If this celebrity can utter such words, Elonis pleads, amateurs like him should be able to post similar things on social media. But context matters. "Taken in context," lyrics in songs that are performed for an audience or sold in recorded form are unlikely to be interpreted as a real threat to a real person. Watts, supra,at 708, 89 S.Ct. 1399. Statements on social media that are pointedly directed at their victims, by contrast, are much more likely to be taken seriously. To hold otherwise would grant a license to anyone who is clever enough to dress up a real threat in the guise of rap lyrics, a parody, or something similar.
The facts of this case illustrate the point. Imagine the effect on Elonis's estranged wife when she read this: " 'If I only knew then what I know now ... I would have smothered your ass with a pillow, dumped your body in the back seat, dropped you off in Toad Creek and made it look like a rape and murder.' " 730 F.3d 321, 324 (C.A.3 2013). Or this: "There's one way to love you but a thousand ways to kill you. I'm not going to rest until your body is a mess, soaked in blood and dying from all the little cuts." Ibid.Or this: "Fold up your [protection from abuse order] and put *2017 it in your pocket[.] Is it thick enough to stop a bullet?" Id.,at 325.
There was evidence that Elonis made sure his wife saw his posts. And she testified that they made her feel " 'extremely afraid' " and " 'like [she] was being stalked.' " Ibid.Considering the context, who could blame her? Threats of violence and intimidation are among the most favored weapons of domestic abusers, and the rise of social media has only made those tactics more commonplace. See Brief for The National Network to End Domestic Violence et al. as Amici Curiae4-16. A fig leaf of artistic expression cannot convert such hurtful, valueless threats into protected speech.
It can be argued that § 875(c), if not limited to threats made with the intent to harm, will chill statements that do not qualify as true threats, e.g.,statements that may be literally threatening but are plainly not meant to be taken seriously. We have sometimes cautioned that it is necessary to "exten [d] a measure of strategic protection" to otherwise unprotected false statements of fact in order to ensure enough " 'breathing space' " for protected speech. Gertz v. Robert Welch, Inc.,418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)(quoting NAACP v. Button,371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)). A similar argument might be made with respect to threats. But we have also held that the law provides adequate breathing space when it requires proof that false statements were made with reckless disregard of their falsity. See New York Times,376 U.S., at 279-280, 84 S.Ct. 710(civil liability); Garrison,379 U.S., at 74-75, 85 S.Ct. 209(criminal liability). Requiring proof of recklessness is similarly sufficient here.
III
Finally, because the jury instructions in this case did not require proof of recklessness, I would vacate the judgment below and remand for the Court of Appeals to decide in the first instance whether Elonis's conviction could be upheld under a recklessness standard.
We do not lightly overturn criminal convictions, even where it appears that the district court might have erred. To benefit from a favorable ruling on appeal, a defendant must have actually asked for the legal rule the appellate court adopts. Rule 30(d) of the Federal Rules of Criminal Procedurerequires a defendant to "inform the court of the specific objection and the grounds for the objection." An objection cannot be vague or open-ended. It must specificallyidentify the alleged error. And failure to lodge a sufficient objection "precludes appellate review," except for plain error. Rule 30(d); see also 2A C. Wright & P. Henning, Federal Practice and Procedure § 484, pp. 433-435 (4th ed. 2009).
At trial, Elonis objected to the District Court's instruction, but he did not argue for recklessness. Instead, he proposed instructions that would have required proof that he acted purposefully or with knowledge that his statements would be received as threats. See App. 19-21. He advanced the same position on appeal and in this Court. See Brief for Petitioner 29 ("Section 875(c)requires proof that the defendant intendedthe charged statement to be a 'threat' " (emphasis in original)); Corrected Brief of Appellant in No. 12-3798 (CA3), p. 14 ("[A] 'true threat' has been uttered only if the speaker acted with subjective intent to threaten" (same)). And at oral argument before this Court, he expressly disclaimed any agreement with a recklessness standard-which the Third Circuit remains free to adopt. Tr. of Oral Arg. 8:22-23 ("[W]e would say that recklessness is not justif[ied]"). I would therefore *2018 remand for the Third Circuit to determine if Elonis's failure (indeed, refusal) to argue for recklessness prevents reversal of his conviction.
The Third Circuit should also have the opportunity to consider whether the conviction can be upheld on harmless-error grounds. "We have often applied harmless-error analysis to cases involving improper instructions." Neder v. United States,527 U.S. 1, 9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); see also, e.g.,Pope v. Illinois,481 U.S. 497, 503-504, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987)(remanding for harmless-error analysis after holding that jury instruction misstated obscenity standard). And the Third Circuit has previously upheld convictions where erroneous jury instructions proved harmless. See, e.g., United States v. Saybolt,577 F.3d 195, 206-207 (2009). It should be given the chance to address that possibility here.