(Slip Opinion) OCTOBER TERM, 2014 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ELONIS *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 13–983.   Argued December 1, 2014—Decided June 1, 2015

After his wife left him, petitioner Anthony Douglas Elonis, under the pseudonym "Tone Dougie," used the social networking Web site Facebook to post self-styled rap lyrics containing graphically violent language and imagery concerning his wife, co-workers, a kindergarten class, and state and federal law enforcement. These posts were often interspersed with disclaimers that the lyrics were "fictitious" and not intended to depict real persons, and with statements that Elonis was exercising his First Amendment rights. Many who knew him saw his posts as threatening, however, including his boss, who fired him for threatening co-workers, and his wife, who sought and was granted a state court protection-from-abuse order against him.

When Elonis's former employer informed the Federal Bureau of Investigation of the posts, the agency began monitoring Elonis's Facebook activity and eventually arrested him. He was charged with five counts of violating 18 U. S. C. §875(c), which makes it a federal crime to transmit in interstate commerce "any communication containing any threat . . . to injure the person of another." At trial, Elonis requested a jury instruction that the Government was required to prove that he intended to communicate a "true threat." Instead, the District Court told the jury that Elonis could be found guilty if a reasonable person would foresee that his statements would be interpreted as a threat. Elonis was convicted on four of the five counts and renewed his jury instruction challenge on appeal. The Third Circuit affirmed, holding that Section 875(c) requires only the intent to communicate words that the defendant understands, and that a reasonable person would view as a threat.

*Held*: The Third Circuit's instruction, requiring only negligence with respect to the communication of a threat, is not sufficient to support a

conviction under Section 875(c).  Pp. 7–17.

(a) Section 875(c) does not indicate whether the defendant must intend that the communication contain a threat, and the parties can show no indication of a particular mental state requirement in the statute's text.  Elonis claims that the word "threat," by definition, conveys the intent to inflict harm.  But common definitions of "threat" speak to what the statement conveys—not to the author's mental state.  The Government argues that the express "intent to extort" requirements in neighboring Sections 875(b) and (d) should preclude courts from implying an unexpressed "intent to threaten" requirement in Section 875(c).  The most that can be concluded from such a comparison, however, is that Congress did not mean to confine Section 875(c) to crimes of extortion, not that it meant to exclude a mental state requirement.  Pp. 7–9.

(b) The Court does not regard "mere omission from a criminal enactment of any mention of criminal intent" as dispensing with such a requirement.  *Morissette* v. *United States*, 342 U. S. 246, 250.  This rule of construction reflects the basic principle that "wrongdoing must be conscious to be criminal," and that a defendant must be "blameworthy in mind" before he can be found guilty.  *Id.,* at 252.  The "general rule" is that a guilty mind is "a necessary element in the indictment and proof of every crime."  *United States* v. *Balint*, 258 U. S. 250, 251.  Thus, criminal statutes are generally interpreted "to include broadly applicable scienter requirements, even where the statute . . . does not contain them."  *United States* v. *X-Citement Video, Inc.*, 513 U. S. 64, 70.  This does not mean that a defendant must know that his conduct is illegal, but a defendant must have knowledge of "the facts that make his conduct fit the definition of the offense."  *Staples* v. *United States*, 511 U. S. 600, 608, n. 3.  Federal criminal statutes that are silent on the required mental state should be read to include "only that *mens rea* which is necessary to separate" wrongful from innocent conduct.  *Carter* v. *United States*, 530 U. S. 255, 269.  In some cases, a general requirement that a defendant act knowingly is sufficient, but where such a requirement "would fail to protect the innocent actor," the statute "would need to be read to require . . . specific intent."  *Ibid.*  Pp. 9–13.

(c) The "presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct."  *X-Citement Video*, 513 U. S*.,* at 72.  In the context of Section 875(c), that requires proof that a communication was transmitted and that it contained a threat.  And because "the crucial element separating legal innocence from wrongful conduct," *id.,* at 73, is the threatening nature of the communication, the mental state requirement must apply to the fact that the communication contains a

Syllabus

threat. Elonis's conviction was premised solely on how his posts would be viewed by a reasonable person, a standard feature of civil liability in tort law inconsistent with the conventional criminal conduct requirement of "awareness of some wrongdoing," *Staples*, 511 U. S., at 606–607. This Court "ha[s] long been reluctant to infer that a negligence standard was intended in criminal statutes." *Rogers* v. *United States*, 422 U. S. 35, 47 (Marshall, J., concurring). And the Government fails to show that the instructions in this case required more than a mental state of negligence. *Hamling* v. *United States*, 418 U. S. 87, distinguished. Section 875(c)'s mental state requirement is satisfied if the defendant transmits a communication for the purpose of issuing a threat or with knowledge that the communication will be viewed as a threat. The Court declines to address whether a mental state of recklessness would also suffice. Given the disposition here, it is unnecessary to consider any First Amendment issues. Pp. 13–17.

730 F. 3d. 321, reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. ALITO, J., filed an opinion concurring in part and dissenting in part. THOMAS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 13–983

ANTHONY DOUGLAS ELONIS, PETITIONER *v.*
UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[June 1, 2015]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Federal law makes it a crime to transmit in interstate commerce "any communication containing any threat . . . to injure the person of another." 18 U. S. C. §875(c). Petitioner was convicted of violating this provision under instructions that required the jury to find that he communicated what a reasonable person would regard as a threat. The question is whether the statute also requires that the defendant be aware of the threatening nature of the communication, and—if not—whether the First Amendment requires such a showing.

## I
### A

Anthony Douglas Elonis was an active user of the social networking Web site Facebook. Users of that Web site may post items on their Facebook page that are accessible to other users, including Facebook "friends" who are notified when new content is posted. In May 2010, Elonis's wife of nearly seven years left him, taking with her their two young children. Elonis began "listening to more vio-

lent music" and posting self-styled "rap" lyrics inspired by the music. App. 204, 226. Eventually, Elonis changed the user name on his Facebook page from his actual name to a rap-style nom de plume, "Tone Dougie," to distinguish himself from his "on-line persona." *Id.*, at 249, 265. The lyrics Elonis posted as "Tone Dougie" included graphically violent language and imagery. This material was often interspersed with disclaimers that the lyrics were "fictitious," with no intentional "resemblance to real persons." *Id.,* at 331, 329. Elonis posted an explanation to another Facebook user that "I'm doing this for me. My writing is therapeutic." *Id.,* at 329; see also *id.*, at 205 (testifying that it "helps me to deal with the pain").

Elonis's co-workers and friends viewed the posts in a different light. Around Halloween of 2010, Elonis posted a photograph of himself and a co-worker at a "Halloween Haunt" event at the amusement park where they worked. In the photograph, Elonis was holding a toy knife against his co-worker's neck, and in the caption Elonis wrote, "I wish." *Id.,* at 340. Elonis was not Facebook friends with the co-worker and did not "tag" her, a Facebook feature that would have alerted her to the posting. *Id.,* at 175; Brief for Petitioner 6, 9. But the chief of park security was a Facebook "friend" of Elonis, saw the photograph, and fired him. App. 114–116; Brief for Petitioner 9.

In response, Elonis posted a new entry on his Facebook page:

> "Moles! Didn't I tell y'all I had several? Y'all sayin' I had access to keys for all the f***in' gates. That I have sinister plans for all my friends and must have taken home a couple. Y'all think it's too dark and foggy to secure your facility from a man as mad as me? You see, even without a paycheck, I'm still the main attraction. Whoever thought the Halloween Haunt could be so f***in' scary?" App. 332.

This post became the basis for Count One of Elonis's subsequent indictment, threatening park patrons and employees.

Elonis's posts frequently included crude, degrading, and violent material about his soon-to-be ex-wife. Shortly after he was fired, Elonis posted an adaptation of a satirical sketch that he and his wife had watched together. *Id.,* at 164–165, 207. In the actual sketch, called "It's Illegal to Say . . . ," a comedian explains that it is illegal for a person to say he wishes to kill the President, but not illegal to explain that it is illegal for him to say that. When Elonis posted the script of the sketch, however, he substituted his wife for the President. The posting was part of the basis for Count Two of the indictment, threatening his wife:

> "Hi, I'm Tone Elonis.
> Did you know that it's illegal for me to say I want to kill my wife? . . .
> It's one of the only sentences that I'm not allowed to say. . . .
> Now it was okay for me to say it right then because I was just telling you that it's illegal for me to say I want to kill my wife. . . .
> Um, but what's interesting is that it's very illegal to say I really, really think someone out there should kill my wife. . . .
> But not illegal to say with a mortar launcher.
> Because that's its own sentence. . . .
> I also found out that it's incredibly illegal, extremely illegal to go on Facebook and say something like the best place to fire a mortar launcher at her house would be from the cornfield behind it because of easy access to a getaway road and you'd have a clear line of sight through the sun room. . . .
> Yet even more illegal to show an illustrated diagram.
> [diagram of the house]. . . ." *Id.,* at 333.

The details about the home were accurate. *Id.,* at 154. At the bottom of the post, Elonis included a link to the video of the original skit, and wrote, "Art is about pushing limits. I'm willing to go to jail for my Constitutional rights. Are you?" *Id.,* at 333.

After viewing some of Elonis's posts, his wife felt "extremely afraid for [her] life." *Id.,* at 156. A state court granted her a three-year protection-from-abuse order against Elonis (essentially, a restraining order). *Id.,* at 148–150. Elonis referred to the order in another post on his "Tone Dougie" page, also included in Count Two of the indictment:

> "Fold up your [protection-from-abuse order] and put it in your pocket
> Is it thick enough to stop a bullet?
> Try to enforce an Order
> that was improperly granted in the first place
> Me thinks the Judge needs an education
> on true threat jurisprudence
> And prison time'll add zeros to my settlement . . .
> And if worse comes to worse
> I've got enough explosives
> to take care of the State Police and the Sheriff's Department." *Id.,* at 334.

At the bottom of this post was a link to the Wikipedia article on "Freedom of speech." *Ibid.* Elonis's reference to the police was the basis for Count Three of his indictment, threatening law enforcement officers.

That same month, interspersed with posts about a movie Elonis liked and observations on a comedian's social commentary, *id.,* at 356–358, Elonis posted an entry that gave rise to Count Four of his indictment:

> "That's it, I've had about enough
> I'm checking out and making a name for myself
> Enough elementary schools in a ten mile radius

to initiate the most heinous school shooting ever imagined
And hell hath no fury like a crazy man in a Kinder-
garten class
The only question is . . . which one?" *Id.,* at 335.

Meanwhile, park security had informed both local police
and the Federal Bureau of Investigation about Elonis's
posts, and FBI Agent Denise Stevens had created a Face-
book account to monitor his online activity. *Id.,* at 49–51,
125. After the post about a school shooting, Agent Stevens
and her partner visited Elonis at his house. *Id.,* at 65–66.
Following their visit, during which Elonis was polite but
uncooperative, Elonis posted another entry on his Face-
book page, called "Little Agent Lady," which led to Count
Five:

"You know your s***'s ridiculous
when you have the FBI knockin' at yo' door
Little Agent lady stood so close
Took all the strength I had not to turn the b**** ghost
Pull my knife, flick my wrist, and slit her throat
Leave her bleedin' from her jugular in the arms of her
partner
[laughter]
So the next time you knock, you best be serving a
warrant
And bring yo' SWAT and an explosives expert while
you're at it
Cause little did y'all know, I was strapped wit' a bomb
Why do you think it took me so long to get dressed
with no shoes on?
I was jus' waitin' for y'all to handcuff me and pat me
down
Touch the detonator in my pocket and we're all goin'
[BOOM!]
Are all the pieces comin' together?
S***, I'm just a crazy sociopath

that gets off playin' you stupid f***s like a fiddle
And if y'all didn't hear, I'm gonna be famous
Cause I'm just an aspiring rapper who likes the attention
who happens to be under investigation for terrorism
cause y'all think I'm ready to turn the Valley into Fallujah
But I ain't gonna tell you which bridge is gonna fall into which river or road
And if you really believe this s***
I'll have some bridge rubble to sell you tomorrow
[BOOM!][BOOM!][BOOM!]" *Id.,* at 336.

B

A grand jury indicted Elonis for making threats to injure patrons and employees of the park, his estranged wife, police officers, a kindergarten class, and an FBI agent, all in violation of 18 U. S. C. §875(c). App. 14–17. In the District Court, Elonis moved to dismiss the indictment for failing to allege that he had intended to threaten anyone. The District Court denied the motion, holding that Third Circuit precedent required only that Elonis "intentionally made the communication, not that he intended to make a threat." App. to Pet. for Cert. 51a. At trial, Elonis testified that his posts emulated the rap lyrics of the well-known performer Eminem, some of which involve fantasies about killing his ex-wife. App. 225. In Elonis's view, he had posted "nothing . . . that hasn't been said already." *Id.,* at 205. The Government presented as witnesses Elonis's wife and co-workers, all of whom said they felt afraid and viewed Elonis's posts as serious threats. See, *e.g., id.,* at 153, 158.

Elonis requested a jury instruction that "the government must prove that he intended to communicate a true threat." *Id.,* at 21. See also *id.,* at 267–269, 303. The District Court denied that request. The jury instructions

instead informed the jury that

> "A statement is a true threat when a defendant inten-
> tionally makes a statement in a context or under such
> circumstances wherein a reasonable person would
> foresee that the statement would be interpreted by
> those to whom the maker communicates the state-
> ment as a serious expression of an intention to inflict
> bodily injury or take the life of an individual." *Id.,*
> at 301.

The Government's closing argument emphasized that it
was irrelevant whether Elonis intended the postings to be
threats—"it doesn't matter what he thinks." *Id.,* at 286. A
jury convicted Elonis on four of the five counts against
him, acquitting only on the charge of threatening park
patrons and employees. *Id.,* at 309. Elonis was sentenced
to three years, eight months' imprisonment and three
years' supervised release.

Elonis renewed his challenge to the jury instructions in
the Court of Appeals, contending that the jury should have
been required to find that he intended his posts to be
threats. The Court of Appeals disagreed, holding that the
intent required by Section 875(c) is only the intent to
communicate words that the defendant understands, and
that a reasonable person would view as a threat. 730
F. 3d 321, 332 (CA3 2013).

We granted certiorari. 573 U. S. \_\_\_ (2014).

## II

### A

An individual who "transmits in interstate or foreign
commerce any communication containing any threat to
kidnap any person or any threat to injure the person of
another" is guilty of a felony and faces up to five years'
imprisonment. 18 U. S. C. §875(c). This statute requires
that a communication be transmitted and that the com-

munication contain a threat. It does not specify that the defendant must have any mental state with respect to these elements. In particular, it does not indicate whether the defendant must intend that his communication contain a threat.

Elonis argues that the word "threat" itself in Section 875(c) imposes such a requirement. According to Elonis, every definition of "threat" or "threaten" conveys the notion of an intent to inflict harm. Brief for Petitioner 23. See *United States* v. *Jeffries*, 692 F. 3d 473, 483 (CA6 2012) (Sutton, J., *dubitante*). *E.g.*, 11 Oxford English Dictionary 353 (1933) ("to declare (usually conditionally) one's intention of inflicting injury upon"); Webster's New International Dictionary 2633 (2d ed. 1954) ("*Law*, specif., an expression of an intention to inflict loss or harm on another by illegal means"); Black's Law Dictionary 1519 (8th ed. 2004) ("A communicated intent to inflict harm or loss on another").

These definitions, however, speak to what the statement conveys—not to the mental state of the author. For example, an anonymous letter that says "I'm going to kill you" is "an expression of an intention to inflict loss or harm" regardless of the author's intent. A victim who receives that letter in the mail has received a threat, even if the author believes (wrongly) that his message will be taken as a joke.

For its part, the Government argues that Section 875(c) should be read in light of its neighboring provisions, Sections 875(b) and 875(d). Those provisions also prohibit certain types of threats, but expressly include a mental state requirement of an "intent to extort." See 18 U. S. C. §875(b) (proscribing threats to injure or kidnap made "with intent to extort"); §875(d) (proscribing threats to property or reputation made "with intent to extort"). According to the Government, the express "intent to extort" requirements in Sections 875(b) and (d) should pre-

clude courts from implying an unexpressed "intent to threaten" requirement in Section 875(c). See *Russello* v. *United States*, 464 U. S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

The Government takes this *expressio unius est exclusio alterius* canon too far. The fact that Congress excluded the requirement of an "intent to extort" from Section 875(c) is strong evidence that Congress did not mean to confine Section 875(c) to crimes of extortion. But that does not suggest that Congress, at the same time, also meant to exclude a requirement that a defendant act with a certain mental state in communicating a threat. The most we can conclude from the language of Section 875(c) and its neighboring provisions is that Congress meant to proscribe a broad class of threats in Section 875(c), but did not identify what mental state, if any, a defendant must have to be convicted.

In sum, neither Elonis nor the Government has identified any indication of a particular mental state requirement in the text of Section 875(c).

B

The fact that the statute does not specify any required mental state, however, does not mean that none exists. We have repeatedly held that "mere omission from a criminal enactment of any mention of criminal intent" should not be read "as dispensing with it." *Morissette* v. *United States*, 342 U. S. 246, 250 (1952). This rule of construction reflects the basic principle that "wrongdoing must be conscious to be criminal." *Id.*, at 252. As Justice Jackson explained, this principle is "as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the

normal individual to choose between good and evil." *Id.*, at 250. The "central thought" is that a defendant must be "blameworthy in mind" before he can be found guilty, a concept courts have expressed over time through various terms such as *mens rea*, scienter, malice aforethought, guilty knowledge, and the like. *Id.*, at 252; 1 W. LaFave, Substantive Criminal Law §5.1, pp. 332–333 (2d ed. 2003). Although there are exceptions, the "general rule" is that a guilty mind is "a necessary element in the indictment and proof of every crime." *United States* v. *Balint*, 258 U. S. 250, 251 (1922). We therefore generally "interpret[] criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them." *United States* v. *X-Citement Video, Inc.*, 513 U. S. 64, 70 (1994).

This is not to say that a defendant must know that his conduct is illegal before he may be found guilty. The familiar maxim "ignorance of the law is no excuse" typically holds true. Instead, our cases have explained that a defendant generally must "know the facts that make his conduct fit the definition of the offense," *Staples* v. *United States*, 511 U. S. 600, 608, n. 3 (1994), even if he does not know that those facts give rise to a crime.

*Morissette*, for example, involved an individual who had taken spent shell casings from a Government bombing range, believing them to have been abandoned. During his trial for "knowingly convert[ing]" property of the United States, the judge instructed the jury that the only question was whether the defendant had knowingly taken the property without authorization. 342 U. S., at 248–249. This Court reversed the defendant's conviction, ruling that he had to know not only that he was taking the casings, but also that someone else still had property rights in them. He could not be found liable "if he truly believed [the casings] to be abandoned." *Id.,* at 271; see *id.,* at 276.

By the same token, in *Liparota* v. *United States*, we

considered a statute making it a crime to knowingly possess or use food stamps in an unauthorized manner. 471 U. S. 419, 420 (1985). The Government's argument, similar to its position in this case, was that a defendant's conviction could be upheld if he knowingly possessed or used the food stamps, and in fact his possession or use was unauthorized. *Id.,* at 423. But this Court rejected that interpretation of the statute, because it would have criminalized "a broad range of apparently innocent conduct" and swept in individuals who had no knowledge of the facts that made their conduct blameworthy. *Id.,* at 426. For example, the statute made it illegal to use food stamps at a store that charged higher prices to food stamp customers. Without a mental state requirement in the statute, an individual who unwittingly paid higher prices would be guilty under the Government's interpretation. *Ibid.* The Court noted that Congress *could* have intended to cover such a "broad range of conduct," but declined "to adopt such a sweeping interpretation" in the absence of a clear indication that Congress intended that result. *Id.,* at 427. The Court instead construed the statute to require knowledge of the facts that made the use of the food stamps unauthorized. *Id.,* at 425.

To take another example, in *Posters 'N' Things, Ltd.* v. *United States*, this Court interpreted a federal statute prohibiting the sale of drug paraphernalia. 511 U. S. 513 (1994). Whether the items in question qualified as drug paraphernalia was an objective question that did not depend on the defendant's state of mind. *Id.,* at 517–522. But, we held, an individual could not be convicted of selling such paraphernalia unless he "knew that the items at issue [were] likely to be used with illegal drugs." *Id.,* at 524. Such a showing was necessary to establish the defendant's culpable state of mind.

And again, in *X-Citement Video*, we considered a statute criminalizing the distribution of visual depictions of mi-

nors engaged in sexually explicit conduct. 513 U. S., at 68. We rejected a reading of the statute which would have required only that a defendant knowingly send the prohibited materials, regardless of whether he knew the age of the performers. *Id.,* at 68–69. We held instead that a defendant must also know that those depicted were minors, because that was "the crucial element separating legal innocence from wrongful conduct." *Id.,* at 73. See also *Staples,* 511 U. S., at 619 (defendant must know that his weapon had automatic firing capability to be convicted of possession of such a weapon).

When interpreting federal criminal statutes that are silent on the required mental state, we read into the statute "only that *mens rea* which is necessary to separate wrongful conduct from 'otherwise innocent conduct.'" *Carter* v. *United States*, 530 U. S. 255, 269 (2000) (quoting *X-Citement Video,* 513 U. S., at 72). In some cases, a general requirement that a defendant *act* knowingly is itself an adequate safeguard. For example, in *Carter*, we considered whether a conviction under 18 U. S. C. §2113(a), for taking "by force and violence" items of value belonging to or in the care of a bank, requires that a defendant have the intent to steal. 530 U. S., at 261. We held that once the Government proves the defendant forcibly took the money, "the concerns underlying the presumption in favor of scienter are fully satisfied, for a forceful taking—even by a defendant who takes under a good-faith claim of right—falls outside the realm of . . . 'otherwise innocent'" conduct. *Id.*, at 269–270. In other instances, however, requiring only that the defendant act knowingly "would fail to protect the innocent actor." *Id.*, at 269. A statute similar to Section 2113(a) that did not require a forcible taking or the intent to steal "would run the risk of punishing seemingly innocent conduct in the case of a defendant who peaceably takes money believing it to be his." *Ibid.* In such a case, the Court explained, the

statute "would need to be read to require . . . that the defendant take the money with 'intent to steal or purloin.'" *Ibid.*

C

Section 875(c), as noted, requires proof that a communication was transmitted and that it contained a threat. The "presumption in favor of a scienter requirement should apply to *each* of the statutory elements that criminalize otherwise innocent conduct." *X-Citement Video,* 513 U. S., at 72 (emphasis added). The parties agree that a defendant under Section 875(c) must know that he is transmitting a communication. But communicating *something* is not what makes the conduct "wrongful." Here "the crucial element separating legal innocence from wrongful conduct" is the threatening nature of the communication. *Id.,* at 73. The mental state requirement must therefore apply to the fact that the communication contains a threat.

Elonis's conviction, however, was premised solely on how his posts would be understood by a reasonable person. Such a "reasonable person" standard is a familiar feature of civil liability in tort law, but is inconsistent with "the conventional requirement for criminal conduct— *awareness* of some wrongdoing." *Staples,* 511 U. S., at 606–607 (quoting *United States* v. *Dotterweich,* 320 U. S. 277, 281 (1943); emphasis added). Having liability turn on whether a "reasonable person" regards the communication as a threat—regardless of what the defendant thinks— "reduces culpability on the all-important element of the crime to negligence," *Jeffries,* 692 F. 3d, at 484 (Sutton, J., *dubitante*), and we "have long been reluctant to infer that a negligence standard was intended in criminal statutes," *Rogers* v. *United States,* 422 U. S. 35, 47 (1975) (Marshall, J., concurring) (citing *Morissette,* 342 U. S. 246). See 1 C. Torcia, Wharton's Criminal Law §27, pp. 171–172 (15th

ed. 1993); *Cochran* v. *United States*, 157 U. S. 286, 294 (1895) (defendant could face "liability in a civil action for negligence, but he could only be held criminally for an evil intent actually existing in his mind"). Under these principles, "what [Elonis] thinks" does matter. App. 286.

The Government is at pains to characterize its position as something other than a negligence standard, emphasizing that its approach would require proof that a defendant "comprehended [the] contents and context" of the communication. Brief for United States 29. The Government gives two examples of individuals who, in its view, would lack this necessary mental state—a "foreigner, ignorant of the English language," who would not know the meaning of the words at issue, or an individual mailing a sealed envelope without knowing its contents. *Ibid.* But the fact that the Government would require a defendant to actually know the words of and circumstances surrounding a communication does not amount to a rejection of negligence. Criminal negligence standards often incorporate "the circumstances known" to a defendant. ALI, Model Penal Code §2.02(2)(d) (1985). See *id.*, Comment 4, at 241; 1 LaFave, Substantive Criminal Law §5.4, at 372–373. Courts then ask, however, whether a reasonable person equipped with that knowledge, not the actual defendant, would have recognized the harmfulness of his conduct. That is precisely the Government's position here: Elonis can be convicted, the Government contends, if he himself knew the contents and context of his posts, and a reasonable person would have recognized that the posts would be read as genuine threats. That is a negligence standard.

In support of its position the Government relies most heavily on *Hamling* v. *United States*, 418 U. S. 87 (1974). In that case, the Court rejected the argument that individuals could be convicted of mailing obscene material only if they knew the "legal status of the materials" distributed. *Id.*, at 121. Absolving a defendant of liability

because he lacked the knowledge that the materials were legally obscene "would permit the defendant to avoid prosecution by simply claiming that he had not brushed up on the law." *Id.,* at 123. It was instead enough for liability that "a defendant had knowledge of the contents of the materials he distributed, and that he knew the character and nature of the materials." *Ibid.*

This holding does not help the Government. In fact, the Court in *Hamling* approved a state court's conclusion that requiring a defendant to know the character of the material incorporated a "vital element of scienter" so that "not innocent but *calculated purveyance* of filth . . . is exorcised." *Id.,* at 122 (quoting *Mishkin* v. *New York*, 383 U. S. 502, 510 (1966); internal quotation marks omitted). In this case, "calculated purveyance" of a threat would require that Elonis know the threatening nature of his communication. Put simply, the mental state requirement the Court approved in *Hamling* turns on whether a defendant knew the *character* of what was sent, not simply its contents and context.

Contrary to the dissent's suggestion, see *post*, at 4–5, 9–10 (opinion of THOMAS, J.), nothing in *Rosen* v. *United States*, 161 U. S. 29 (1896), undermines this reading. The defendant's contention in *Rosen* was that his indictment for mailing obscene material was invalid because it did not allege that he was aware of the contents of the mailing. *Id.,* at 31–33. That is not at issue here; there is no dispute that Elonis knew the words he communicated. The defendant also argued that he could not be convicted of mailing obscene material if he did not know that the material "could be properly or justly characterized as obscene." *Id.,* at 41. The Court correctly rejected this "ignorance of the law" defense; no such contention is at issue here. See *supra,* at 10.

\*      \*      \*

In light of the foregoing, Elonis's conviction cannot
stand. The jury was instructed that the Government need
prove only that a reasonable person would regard Elonis's
communications as threats, and that was error. Federal
criminal liability generally does not turn solely on the
results of an act without considering the defendant's
mental state. That understanding "took deep and early
root in American soil" and Congress left it intact here:
Under Section 875(c), "wrongdoing must be conscious to be
criminal." *Morissette*, 342 U. S., at 252.

There is no dispute that the mental state requirement in
Section 875(c) is satisfied if the defendant transmits a
communication for the purpose of issuing a threat, or with
knowledge that the communication will be viewed as a
threat. See Tr. of Oral Arg. 25, 56. In response to a ques-
tion at oral argument, Elonis stated that a finding of
recklessness would not be sufficient. See *id.,* at 8–9.
Neither Elonis nor the Government has briefed or argued
that point, and we accordingly decline to address it. See
*Department of Treasury, IRS* v. *FLRA*, 494 U. S. 922, 933
(1990) (this Court is "poorly situated" to address an argu-
ment the Court of Appeals did not consider, the parties did
not brief, and counsel addressed in "only the most cursory
fashion at oral argument"). Given our disposition, it is not
necessary to consider any First Amendment issues.

Both JUSTICE ALITO and JUSTICE THOMAS complain
about our not deciding whether recklessness suffices for
liability under Section 875(c). *Post*, at 1–2 (ALITO, J.,
concurring in part and dissenting in part); *post,* at 1–2
(opinion of THOMAS, J.). JUSTICE ALITO contends that
each party "argued" this issue, *post,* at 2, but they did not
address it at all until oral argument, and even then only
briefly. See Tr. of Oral Arg. at 8, 38–39.

JUSTICE ALITO also suggests that we have not clarified
confusion in the lower courts. That is wrong. Our holding

makes clear that negligence is not sufficient to support a conviction under Section 875(c), contrary to the view of nine Courts of Appeals. Pet. for Cert. 17. There was and is no circuit conflict over the question JUSTICE ALITO and JUSTICE THOMAS would have us decide—whether recklessness suffices for liability under Section 875(c). No Court of Appeals has even addressed that question. We think that is more than sufficient "justification," *post,* at 2 (opinion of ALITO, J.), for us to decline to be the first appellate tribunal to do so.

Such prudence is nothing new. See *United States* v. *Bailey*, 444 U. S. 394, 407 (1980) (declining to decide whether mental state of recklessness or negligence could suffice for criminal liability under 18 U. S. C. §751, even though a "court may someday confront a case" presenting issue); *Ginsberg* v. *New York*, 390 U. S. 629, 644–645 (1968) (rejecting defendant's challenge to obscenity law "makes it unnecessary for us to define further today 'what sort of mental element is requisite to a constitutionally permissible prosecution'"); *Smith* v. *California*, 361 U. S. 147, 154 (1959) (overturning conviction because lower court did not require any mental element under statute, but noting that "[w]e need not and most definitely do not pass today on what sort of mental element is requisite to a constitutionally permissible prosecution"); cf. *Gulf Oil Co.* v. *Bernard*, 452 U. S. 89, 103–104 (1981) (finding a lower court's order impermissible under the First Amendment but not deciding "what standards are mandated by the First Amendment in this kind of case").

We may be "capable of deciding the recklessness issue," *post,* at 2 (opinion of ALITO, J.), but following our usual practice of awaiting a decision below and hearing from the parties would help ensure that we decide it correctly.

The judgment of the United States Court of Appeals for the Third Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

<hr>

No. 13–983

<hr>

## ANTHONY DOUGLAS ELONIS, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[June 1, 2015]

JUSTICE ALITO, concurring in part and dissenting in part.

In *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803), the Court famously proclaimed: "It is emphatically the province and duty of the judicial department to say what the law is." Today, the Court announces: It is emphatically the prerogative of this Court to say only what the law is not.

The Court's disposition of this case is certain to cause confusion and serious problems. Attorneys and judges need to know which mental state is required for conviction under 18 U. S. C. §875(c), an important criminal statute. This case squarely presents that issue, but the Court provides only a partial answer. The Court holds that the jury instructions in this case were defective because they required only negligence in conveying a threat. But the Court refuses to explain what type of intent was necessary. Did the jury need to find that Elonis had the *purpose* of conveying a true threat? Was it enough if he *knew* that his words conveyed such a threat? Would *recklessness* suffice? The Court declines to say. Attorneys and judges are left to guess.

This will have regrettable consequences. While this Court has the luxury of choosing its docket, lower courts and juries are not so fortunate. They must actually decide

cases, and this means applying a standard. If purpose or knowledge is needed and a district court instructs the jury that recklessness suffices, a defendant may be wrongly convicted. On the other hand, if recklessness is enough, and the jury is told that conviction requires proof of more, a guilty defendant may go free. We granted review in this case to resolve a disagreement among the Circuits. But the Court has compounded—not clarified—the confusion.

There is no justification for the Court's refusal to provide an answer. The Court says that "[n]either Elonis nor the Government has briefed or argued" the question whether recklessness is sufficient. *Ante*, at 16. But in fact both parties addressed that issue. Elonis argued that recklessness is not enough, and the Government argued that it more than suffices. If the Court thinks that we cannot decide the recklessness question without additional help from the parties, we can order further briefing and argument. In my view, however, we are capable of deciding the recklessness issue, and we should resolve that question now.

I

Section 875(c) provides in relevant part:

> "Whoever transmits in interstate or foreign commerce any communication containing . . . any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both."

Thus, conviction under this provision requires proof that: (1) the defendant transmitted something, (2) the thing transmitted was a threat to injure the person of another, and (3) the transmission was in interstate or foreign commerce.

At issue in this case is the *mens rea* required with respect to the second element—that the thing transmitted was a threat to injure the person of another. This Court

has not defined the meaning of the term "threat" in §875(c), but in construing the same term in a related statute, the Court distinguished a "true 'threat'" from facetious or hyperbolic remarks. *Watts* v. *United States*, 394 U. S. 705, 708 (1969) (*per curiam*). In my view, the term "threat" in §875(c) can fairly be defined as a statement that is reasonably interpreted as "an expression of an intention to inflict evil, injury, or damage on another." Webster's Third New International Dictionary 2382 (1976). Conviction under §875(c) demands proof that the defendant's transmission was in fact a threat, *i.e.*, that it is reasonable to interpret the transmission as an expression of an intent to harm another. In addition, it must be shown that the defendant was at least reckless as to whether the transmission met that requirement.

Why is recklessness enough? My analysis of the *mens rea* issue follows the same track as the Court's, as far as it goes. I agree with the Court that we should presume that criminal statutes require some sort of *mens rea* for conviction. See *ante,* at 9–13. To be sure, this presumption marks a departure from the way in which we generally interpret statutes. We "ordinarily resist reading words or elements into a statute that do not appear on its face." *Bates* v. *United States,* 522 U. S. 23, 29 (1997). But this step is justified by a well-established pattern in our criminal laws. "For several centuries (at least since 1600) the different common law crimes have been so defined as to require, for guilt, that the defendant's acts or omissions be accompanied by one or more of the various types of fault (intention, knowledge, recklessness or—more rarely—negligence)." 1 W. LaFave, Substantive Criminal Law §5.5, p. 381 (2003). Based on these "background rules of the common law, in which the requirement of some *mens rea* for a crime is firmly embedded," we require "some indication of congressional intent, express or implied, . . . to dispense with *mens rea* as an element of a crime."

*Staples* v. *United States*, 511 U. S. 600, 605–606 (1994).

For a similar reason, I agree with the Court that we should presume that an offense like that created by §875(c) requires more than negligence with respect to a critical element like the one at issue here. See *ante*, at 13–14. As the Court states, "[w]hen interpreting federal criminal statutes that are silent on the required mental state, we read into the statute 'only that *mens rea* which is necessary to separate wrongful conduct from "otherwise innocent conduct." '" *Ante*, at 12 (quoting *Carter* v. *United States*, 530 U. S. 255, 269 (2000)). Whether negligence is morally culpable is an interesting philosophical question, but the answer is at least sufficiently debatable to justify the presumption that a serious offense against the person that lacks any clear common-law counterpart should be presumed to require more.

Once we have passed negligence, however, no further presumptions are defensible. In the hierarchy of mental states that may be required as a condition for criminal liability, the *mens rea* just above negligence is recklessness. Negligence requires only that the defendant "should [have] be[en] aware of a substantial and unjustifiable risk," ALI, Model Penal Code §2.02(2)(d), p. 226 (1985), while recklessness exists "when a person disregards a risk of harm of which he is aware," *Farmer* v. *Brennan*, 511 U. S. 825, 837 (1994); Model Penal Code §2.02(2)(c). And when Congress does not specify a *mens rea* in a criminal statute, we have no justification for inferring that anything more than recklessness is needed. It is quite unusual for us to interpret a statute to contain a requirement that is nowhere set out in the text. Once we have reached recklessness, we have gone as far as we can without stepping over the line that separates interpretation from amendment.

There can be no real dispute that recklessness regarding a risk of serious harm is wrongful conduct. In a wide

variety of contexts, we have described reckless conduct as morally culpable. See, *e.g., Farmer, supra*, at 835–836 (deliberate indifference to an inmate's harm); *Garrison* v. *Louisiana*, 379 U. S. 64, 75 (1964) (criminal libel); *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 279–280 (1964) (civil libel). Indeed, this Court has held that "reckless disregard for human life" may justify the death penalty. *Tison* v. *Arizona*, 481 U. S. 137, 157 (1987). Someone who acts recklessly with respect to conveying a threat necessarily grasps that he is not engaged in innocent conduct. He is not merely careless. He is aware that others could regard his statements as a threat, but he delivers them anyway.

Accordingly, I would hold that a defendant may be convicted under §875(c) if he or she consciously disregards the risk that the communication transmitted will be interpreted as a true threat. Nothing in the Court's noncommittal opinion prevents lower courts from adopting that standard.

## II

There remains the question whether interpreting §875(c) to require no more than recklessness with respect to the element at issue here would violate the First Amendment. Elonis contends that it would. I would reject that argument.

It is settled that the Constitution does not protect true threats. See *Virginia* v. *Black*, 538 U. S. 343, 359–360 (2003); *R. A. V.* v. *St. Paul*, 505 U. S. 377, 388 (1992); *Watts*, 394 U. S., at 707–708. And there are good reasons for that rule: True threats inflict great harm and have little if any social value. A threat may cause serious emotional stress for the person threatened and those who care about that person, and a threat may lead to a violent confrontation. It is true that a communication containing a threat may include other statements that have value

and are entitled to protection. But that does not justify constitutional protection for the threat itself.

Elonis argues that the First Amendment protects a threat if the person making the statement does not actually intend to cause harm. In his view, if a threat is made for a "'therapeutic'" purpose, "to 'deal with the pain' . . . of a wrenching event," or for "cathartic" reasons, the threat is protected. Brief for Petitioner 52–53. But whether or not the person making a threat intends to cause harm, the damage is the same. And the fact that making a threat may have a therapeutic or cathartic effect for the speaker is not sufficient to justify constitutional protection. Some people may experience a therapeutic or cathartic benefit only if they know that their words will cause harm or only if they actually plan to carry out the threat, but surely the First Amendment does not protect them.

Elonis also claims his threats were constitutionally protected works of art. Words like his, he contends, are shielded by the First Amendment because they are similar to words uttered by rappers and singers in public performances and recordings. To make this point, his brief includes a lengthy excerpt from the lyrics of a rap song in which a very well-compensated rapper imagines killing his ex-wife and dumping her body in a lake. If this celebrity can utter such words, Elonis pleads, amateurs like him should be able to post similar things on social media. But context matters. "Taken in context," lyrics in songs that are performed for an audience or sold in recorded form are unlikely to be interpreted as a real threat to a real person. *Watts, supra*, at 708. Statements on social media that are pointedly directed at their victims, by contrast, are much more likely to be taken seriously. To hold otherwise would grant a license to anyone who is clever enough to dress up a real threat in the guise of rap lyrics, a parody, or something similar.

The facts of this case illustrate the point. Imagine the

effect on Elonis's estranged wife when she read this: "'If I only knew then what I know now . . . I would have smothered your ass with a pillow, dumped your body in the back seat, dropped you off in Toad Creek and made it look like a rape and murder.'" 730 F. 3d 321, 324 (CA3 2013). Or this: "There's one way to love you but a thousand ways to kill you. I'm not going to rest until your body is a mess, soaked in blood and dying from all the little cuts." *Ibid.* Or this: "Fold up your [protection from abuse order] and put it in your pocket[.] Is it thick enough to stop a bullet?" *Id.,* at 325.

There was evidence that Elonis made sure his wife saw his posts. And she testified that they made her feel "'extremely afraid'" and "'like [she] was being stalked.'" *Ibid.* Considering the context, who could blame her? Threats of violence and intimidation are among the most favored weapons of domestic abusers, and the rise of social media has only made those tactics more commonplace. See Brief for The National Network to End Domestic Violence et al. as *Amici Curiae* 4–16. A fig leaf of artistic expression cannot convert such hurtful, valueless threats into protected speech.

It can be argued that §875(c), if not limited to threats made with the intent to harm, will chill statements that do not qualify as true threats, *e.g.*, statements that may be literally threatening but are plainly not meant to be taken seriously. We have sometimes cautioned that it is necessary to "exten[d] a measure of strategic protection" to otherwise unprotected false statements of fact in order to ensure enough "'breathing space'" for protected speech. *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 342 (1974) (quoting *NAACP* v. *Button*, 371 U. S. 415, 433 (1963)). A similar argument might be made with respect to threats. But we have also held that the law provides adequate breathing space when it requires proof that false statements were made with reckless disregard of their falsity.

See *New York Times,* 376 U. S., at 279–280 (civil liability); *Garrison,* 379 U. S., at 74–75 (criminal liability). Requiring proof of recklessness is similarly sufficient here.

## III

Finally, because the jury instructions in this case did not require proof of recklessness, I would vacate the judgment below and remand for the Court of Appeals to decide in the first instance whether Elonis's conviction could be upheld under a recklessness standard.

We do not lightly overturn criminal convictions, even where it appears that the district court might have erred. To benefit from a favorable ruling on appeal, a defendant must have actually asked for the legal rule the appellate court adopts. Rule 30(d) of the Federal Rules of Criminal Procedure requires a defendant to "inform the court of the specific objection and the grounds for the objection." An objection cannot be vague or open-ended. It must *specifically* identify the alleged error. And failure to lodge a sufficient objection "precludes appellate review," except for plain error. Rule 30(d); see also 2A C. Wright & P. Henning, Federal Practice and Procedure §484, pp. 433–435 (4th ed. 2009).

At trial, Elonis objected to the District Court's instruction, but he did not argue for recklessness. Instead, he proposed instructions that would have required proof that he acted purposefully or with knowledge that his statements would be received as threats. See App. 19–21. He advanced the same position on appeal and in this Court. See Brief for Petitioner 29 ("Section 875(c) requires proof that the defendant *intended* the charged statement to be a 'threat'" (emphasis in original)); Corrected Brief of Appellant in No. 12–3798 (CA3), p. 14 ("[A] 'true threat' has been uttered only if the speaker acted with *subjective intent to threaten*" (same)). And at oral argument before this Court, he expressly disclaimed any agreement with a

recklessness standard—which the Third Circuit remains free to adopt. Tr. of Oral Arg. 8:22–23 ("[W]e would say that recklessness is not justif[ied]"). I would therefore remand for the Third Circuit to determine if Elonis's failure (indeed, *refusal*) to argue for recklessness prevents reversal of his conviction.

The Third Circuit should also have the opportunity to consider whether the conviction can be upheld on harmless-error grounds. "We have often applied harmless-error analysis to cases involving improper instructions." *Neder* v. *United States*, 527 U. S. 1, 9 (1999); see also, *e.g., Pope* v. *Illinois*, 481 U. S. 497, 503–504 (1987) (remanding for harmless-error analysis after holding that jury instruction misstated obscenity standard). And the Third Circuit has previously upheld convictions where erroneous jury instructions proved harmless. See, *e.g., United States* v. *Saybolt*, 577 F. 3d 195, 206–207 (2009). It should be given the chance to address that possibility here.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–983

_____

## ANTHONY DOUGLAS ELONIS, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[June 1, 2015]

JUSTICE THOMAS, dissenting.

We granted certiorari to resolve a conflict in the lower courts over the appropriate mental state for threat prosecutions under 18 U. S. C. §875(c). Save two, every Circuit to have considered the issue—11 in total—has held that this provision demands proof only of general intent, which here requires no more than that a defendant knew he transmitted a communication, knew the words used in that communication, and understood the ordinary meaning of those words in the relevant context. The outliers are the Ninth and Tenth Circuits, which have concluded that proof of an intent to threaten was necessary for conviction. Adopting the minority position, Elonis urges us to hold that §875(c) and the First Amendment require proof of an intent to threaten. The Government in turn advocates a general-intent approach.

Rather than resolve the conflict, the Court casts aside the approach used in nine Circuits and leaves nothing in its place. Lower courts are thus left to guess at the appropriate mental state for §875(c). All they know after today's decision is that a requirement of general intent will not do. But they can safely infer that a majority of this Court would not adopt an intent-to-threaten requirement, as the opinion carefully leaves open the possibility that recklessness may be enough. See *ante,* at 16–17.

This failure to decide throws everyone from appellate judges to everyday Facebook users into a state of uncertainty.  This uncertainty could have been avoided had we simply adhered to the background rule of the common law favoring general intent.  Although I am sympathetic to my colleagues' policy concerns about the risks associated with threat prosecutions, the answer to such fears is not to discard our traditional approach to state-of-mind requirements in criminal law.  Because the Court of Appeals properly applied the general-intent standard, and because the communications transmitted by Elonis were "true threats" unprotected by the First Amendment, I would affirm the judgment below.

## I

## A

Enacted in 1939, §875(c) provides, "Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both." Because §875(c) criminalizes speech, the First Amendment requires that the term "threat" be limited to a narrow class of historically unprotected communications called "true threats."  To qualify as a true threat, a communication must be a serious expression of an intention to commit unlawful physical violence, not merely "political hyperbole"; "vehement, caustic, and sometimes unpleasantly sharp attacks"; or "vituperative, abusive, and inexact" statements.  *Watts* v. *United States*, 394 U. S. 705, 708 (1969) (*per curiam*) (internal quotation marks omitted).  It also cannot be determined solely by the reaction of the recipient, but must instead be "determined by the interpretation of a *reasonable* recipient familiar with the context of the communication," *United States* v. *Darby*, 37 F. 3d 1059, 1066 (CA4 1994) (emphasis added), lest histor-

ically protected speech be suppressed at the will of an eggshell observer, cf. *Cox* v. *Louisiana*, 379 U. S. 536, 551 (1965) ("[C]onstitutional rights may not be denied simply because of hostility to their assertion or exercise" (internal quotation marks omitted)). There is thus no dispute that, at a minimum, §875(c) requires an objective showing: The communication must be one that "a reasonable observer would construe as a true threat to another." *United States* v. *Jeffries*, 692 F. 3d 473, 478 (CA6 2012). And there is no dispute that the posts at issue here meet that objective standard.

The only dispute in this case is about the state of mind necessary to convict Elonis for making those posts. On its face, §875(c) does not demand any particular mental state. As the Court correctly explains, the word "threat" does not itself contain a *mens rea* requirement. See *ante,* at 8–9. But because we read criminal statutes "in light of the background rules of the common law, in which the requirement of some *mens rea* for a crime is firmly embedded," we require "some indication of congressional intent, express or implied, . . . to dispense with *mens rea* as an element of a crime." *Staples* v. *United States*, 511 U. S. 600, 605–606 (1994) (citation omitted). Absent such indicia, we ordinarily apply the "presumption in favor of scienter" to require only "proof of *general intent*—that is, that the defendant [must] posses[s] knowledge with respect to the *actus reus* of the crime." *Carter* v. *United States*, 530 U. S. 255, 268 (2000).

Under this "conventional *mens rea* element," "the defendant [must] know the facts that make his conduct illegal," *Staples, supra*, at 605, but he need not know *that* those facts make his conduct illegal. It has long been settled that "the knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law." *Bryan* v. *United States*, 524 U. S. 184, 192 (1998) (internal quotation marks omitted). For

instance, in *Posters 'N' Things, Ltd.* v. *United States*, 511 U. S. 513 (1994), the Court addressed a conviction for selling drug paraphernalia under a statute forbidding anyone to "'make use of the services of the Postal Service or other interstate conveyance as part of a scheme to sell drug paraphernalia,'" *id.,* at 516 (quoting 21 U. S. C. §857(a)(1) (1988 ed.)).  In applying the presumption in favor of scienter, the Court concluded that "although the Government must establish that the defendant knew that the items at issue are likely to be used with illegal drugs, it need not prove specific knowledge that the items are 'drug paraphernalia' within the meaning of the statute." 511 U. S.*,* at 524.

Our default rule in favor of general intent applies with full force to criminal statutes addressing speech.  Well over 100 years ago, this Court considered a conviction under a federal obscenity statute that punished anyone "'who shall knowingly deposit, or cause to be deposited, for mailing or delivery,'" any "'obscene, lewd, or lascivious book, pamphlet, picture, paper, writing, print, or other publication of an indecent character.'"  *Rosen* v. *United States*, 161 U. S. 29, 30 (1896) (quoting Rev. Stat. §3893). In that case, as here, the defendant argued that, even if "he may have had . . . actual knowledge or notice of [the paper's] contents" when he put it in the mail, he could not "be convicted of the offence . . . unless he knew or believed that such paper could be properly or justly characterized as obscene, lewd, and lascivious."  161 U. S.*,* at 41.  The Court rejected that theory, concluding that if the material was actually obscene and "deposited in the mail by one who knew or had notice at the time of its contents, the offence is complete, although the defendant himself did not regard the paper as one that the statute forbade to be carried in the mails."  *Ibid.*  As the Court explained, "Congress did not intend that the question as to the character of the paper should depend upon the opinion or belief of

the person who, with knowledge or notice of [the paper's] contents, assumed the responsibility of putting it in the mails of the United States," because "[e]very one who uses the mails of the United States for carrying papers or publications must take notice of . . . what must be deemed obscene, lewd, and lascivious." *Id.,* at 41–42.

This Court reaffirmed *Rosen*'s holding in *Hamling* v. *United States*, 418 U. S. 87 (1974), when it considered a challenge to convictions under the successor federal statute, see *id.,* at 98, n. 8 (citing 18 U. S. C. §1461 (1970 ed.)). Relying on *Rosen,* the Court rejected the argument that the statute required "proof both of knowledge of the contents of the material and awareness of the obscene character of the material." 418 U. S*.,* at 120 (internal quotation marks omitted). In approving the jury instruction that the defendants' "belief as to the obscenity or non-obscenity of the material is irrelevant," the Court declined to hold "that the prosecution must prove a defendant's knowledge of the legal status of the materials he distributes." *Id.*, at 120–121 (internal quotation marks omitted). To rule otherwise, the Court observed, "would permit the defendant to avoid prosecution by simply claiming that he had not brushed up on the law." *Id.,* at 123.

Decades before §875(c)'s enactment, courts took the same approach to the first federal threat statute, which prohibited threats against the President. In 1917, Congress enacted a law punishing anyone

> "who knowingly and willfully deposits or causes to be deposited for conveyance in the mail . . . any letter, paper, writing, print, missive, or document containing any threat to take the life of or to inflict bodily harm upon the President of the United States, or who knowingly and willfully otherwise makes any such threat against the President." Act of Feb. 14, 1917, ch. 64, 39 Stat. 919.

Courts applying this statute shortly after its enactment appeared to require proof of only general intent. In *Ragansky* v. *United States*, 253 F. 643 (CA7 1918), for instance, a Court of Appeals held that "[a] threat is knowingly made, if the maker of it comprehends the meaning of the words uttered by him," and "is willfully made, if in addition to comprehending the meaning of his words, the maker voluntarily and intentionally utters them as the declaration of an apparent determination to carry them into execution," *id.*, at 645. The court consequently rejected the defendant's argument that he could not be convicted when his language "[c]oncededly . . . constituted such a threat" but was meant only "as a joke." *Id.,* at 644. Likewise, in *United States* v. *Stobo*, 251 F. 689 (Del. 1918), a District Court rejected the defendant's objection that there was no allegation "of any facts . . . indicating any intention . . . on the part of the defendant . . . to menace the President of the United States," *id.,* at 693 (internal quotation marks omitted). As it explained, the defendant "is punishable under the act whether he uses the words lightly or with a set purpose to kill," as "[t]he effect upon the minds of the hearers, who cannot read his inward thoughts, is precisely the same." *Ibid.* At a minimum, there is no historical practice requiring more than general intent when a statute regulates speech.

### B

Applying ordinary rules of statutory construction, I would read §875(c) to require proof of general intent. To "know the facts that make his conduct illegal" under §875(c), see *Staples,* 511 U. S., at 605, a defendant must know that he transmitted a communication in interstate or foreign commerce that contained a threat. Knowing that the communication contains a "threat"—a serious expression of an intention to engage in unlawful physical violence—does not, however, require knowing that a jury

will conclude that the communication contains a threat as a matter of law. Instead, like one who mails an "obscene" publication and is prosecuted under the federal obscenity statute, a defendant prosecuted under §875(c) must know only the words used in that communication, along with their ordinary meaning in context.

General intent divides those who know the facts constituting the *actus reus* of this crime from those who do not. For example, someone who transmits a threat who does not know English—or who knows English, but perhaps does not know a threatening idiom—lacks the general intent required under §875(c). See *Ragansky*, *supra,* at 645 ("[A] foreigner, ignorant of the English language, repeating [threatening] words without knowledge of their meaning, may not knowingly have made a threat"). Likewise, the hapless mailman who delivers a threatening letter, ignorant of its contents, should not fear prosecution. A defendant like Elonis, however, who admits that he "knew that what [he] was saying was violent" but supposedly "just wanted to express [him]self," App. 205, acted with the general intent required under §875(c), even if he did not know that a jury would conclude that his communication constituted a "threat" as a matter of law.

Demanding evidence only of general intent also corresponds to §875(c)'s statutory backdrop. As previously discussed, before the enactment of §875(c), courts had read the Presidential threats statute to require proof only of general intent. Given Congress' presumptive awareness of this application of the Presidential threats statute—not to mention this Court's similar approach in the obscenity context, see *Rosen*, 161 U. S*.,* at 41–42—it is difficult to conclude that the Congress that enacted §875(c) in 1939 understood it to contain an implicit mental-state requirement apart from general intent. There is certainly no textual evidence to support this conclusion. If anything, the text supports the opposite inference, as §875(c), unlike

the Presidential threats statute, contains no reference to knowledge or willfulness. Nothing in the statute suggests that Congress departed from the "conventional *mens rea* element" of general intent, *Staples, supra,* at 605; I would not impose a higher mental-state requirement here.

C

The majority refuses to apply these ordinary background principles. Instead, it casts my application of general intent as a negligence standard disfavored in the criminal law. *Ante,* at 13–16. But that characterization misses the mark. Requiring general intent in this context is not the same as requiring mere negligence. Like the mental-state requirements adopted in many of the cases cited by the Court, general intent under §875(c) prevents a defendant from being convicted on the basis of any *fact* beyond his awareness. See, *e.g., United States* v. *X-Citement Video, Inc.*, 513 U. S. 64, 73 (1994) (knowledge of age of persons depicted in explicit materials); *Staples, supra,* at 614–615 (knowledge of firing capability of weapon); *Morissette* v. *United States*, 342 U. S. 246, 270–271 (1952) (knowledge that property belonged to another). In other words, the defendant must *know*—not merely be reckless or negligent with respect to the fact—that he is committing the acts that constitute the *actus reus* of the offense.

But general intent requires *no* mental state (not even a negligent one) concerning the "fact" that certain words meet the *legal* definition of a threat. That approach is particularly appropriate where, as here, that legal status is determined by a jury's application of the legal standard of a "threat" to the contents of a communication. And convicting a defendant despite his ignorance of the legal—or objective—status of his conduct does not mean that he is being punished for negligent conduct. By way of example, a defendant who is convicted of murder despite claim-

ing that he acted in self-defense has not been penalized under a negligence standard merely because he does not know that the jury will reject his argument that his "belief in the necessity of using force to prevent harm to himself [was] a reasonable one." See 2 W. LaFave, Substantive Criminal Law §10.4(c), p. 147 (2d ed. 2003).

The Court apparently does not believe that our traditional approach to the federal obscenity statute involved a negligence standard. It asserts that *Hamling* "approved a state court's conclusion that requiring a defendant to know the character of the material incorporated a 'vital element of scienter' so that 'not innocent but *calculated purveyance* of filth . . . is exorcised.'" *Ante,* at 15 (quoting *Hamling*, 418 U. S.*,* at 122 (in turn quoting *Mishkin* v. *New York*, 383 U. S. 502, 510 (1966)). According to the Court, the mental state approved in *Hamling* thus "turns on whether a defendant knew the *character* of what was sent, not simply its contents and context." *Ante,* at 15. It is unclear what the Court means by its distinction between "character" and "contents and context." "Character" cannot mean *legal* obscenity, as *Hamling* rejected the argument that a defendant must have "awareness of the obscene character of the material." 418 U. S., at 120 (internal quotation marks omitted). Moreover, this discussion was not part of *Hamling*'s holding, which was primarily a reaffirmation of *Rosen*. See 418 U. S.*,* at 120–121; see also *Posters 'N' Things*, 511 U. S.*,* at 524–525 (characterizing *Hamling* as holding that a "statute prohibiting mailing of obscene materials does not require proof that [the] defendant knew the materials at issue met the legal definition of 'obscenity'").

The majority's treatment of *Rosen* is even less persuasive. To shore up its position, it asserts that the critical portion of *Rosen* rejected an "'ignorance of the law' defense," and claims that "no such contention is at issue here." *Ante,* at 15. But the thrust of Elonis' challenge is

that a §875(c) conviction cannot stand if the defendant's subjective belief of what constitutes a "threat" differs from that of a reasonable jury.  That is akin to the argument the defendant made—and lost—in *Rosen*.  That defendant insisted that he could not be convicted for mailing the paper "unless he knew or believed that such paper could be properly or justly characterized as obscene."  161 U. S., at 41. The Court, however, held that the Government did not need to show that the defendant "regard[ed] the paper as one that the statute forbade to be carried in the mails," because the obscene character of the material did not "depend upon the opinion or belief of the person who . . . assumed the responsibility of putting it in the mails." *Ibid.*  The majority's muddying of the waters cannot obscure the fact that today's decision is irreconcilable with *Rosen* and *Hamling*.

D

The majority today at least refrains from requiring an intent to threaten for §875(c) convictions, as Elonis asks us to do.  Elonis contends that proof of a defendant's intent to put the recipient of a threat in fear is necessary for conviction, but that element cannot be found within the statutory text.  "[W]e ordinarily resist reading words or elements into a statute that do not appear on its face," including elements similar to the one Elonis proposes. *E.g., Bates* v. *United States*, 522 U. S. 23, 29 (1997) (declining to read an "intent to defraud" element into a criminal statute).  As the majority correctly explains, nothing in the text of §875(c) itself requires proof of an intent to threaten.  See *ante,* at 8–9.  The absence of such a requirement is significant, as Congress knows how to require a heightened *mens rea* in the context of threat offenses.  See §875(b) (providing for the punishment of "[w]hoever, with intent to extort . . . , transmits in interstate or foreign commerce any communication containing

any threat to kidnap any person or any threat to injure the person of another"); see also §119 (providing for the punishment of "[w]hoever knowingly makes restricted personal information about [certain officials] . . . publicly available . . . with the intent to threaten").

Elonis nonetheless suggests that an intent-to-threaten element is necessary in order to avoid the risk of punishing innocent conduct. But there is nothing absurd about punishing an individual who, with knowledge of the words he uses and their ordinary meaning in context, makes a threat. For instance, a high-school student who sends a letter to his principal stating that he will massacre his classmates with a machine gun, even if he intended the letter as a joke, cannot fairly be described as engaging in innocent conduct. But see *ante,* at 4–5, 16 (concluding that Elonis' conviction under §875(c) for discussing a plan to "'initiate the most heinous school shooting ever imagined'" against "'a Kindergarten class'" cannot stand without proof of some unspecified heightened mental state).

Elonis also insists that we read an intent-to-threaten element into §875(c) in light of the First Amendment. But our practice of construing statutes "to avoid constitutional questions . . . is not a license for the judiciary to rewrite language enacted by the legislature," *Salinas* v. *United States*, 522 U. S. 52, 59–60 (1997) (internal quotation marks omitted), and ordinary background principles of criminal law do not support rewriting §875(c) to include an intent-to-threaten requirement. We have not altered our traditional approach to *mens rea* for other constitutional provisions. See, *e.g., Dean* v. *United States*, 556 U. S. 568, 572–574 (2009) (refusing to read an intent-to-discharge-the-firearm element into a mandatory minimum provision concerning the discharge of a firearm during a particular crime). The First Amendment should be treated no differently.

## II

In light of my conclusion that Elonis was properly convicted under the requirements of §875(c), I must address his argument that his threatening posts were nevertheless protected by the First Amendment.

### A

Elonis does not contend that threats are constitutionally protected speech, nor could he: "From 1791 to the present, . . . our society . . . has permitted restrictions upon the content of speech in a few limited areas," true threats being one of them. *R. A. V.* v. *St. Paul*, 505 U. S. 377, 382–383 (1992); see *id.,* at 388. Instead, Elonis claims that only *intentional* threats fall within this particular historical exception.

If it were clear that intentional threats alone have been punished in our Nation since 1791, I would be inclined to agree. But that is the not the case. Although the Federal Government apparently did not get into the business of regulating threats until 1917, the States have been doing so since the late 18th and early 19th centuries. See, *e.g.,* 1795 N. J. Laws p. 108; Ill. Rev. Code of Laws, Crim. Code §108 (1827) (1827 Ill. Crim. Code); 1832 Fla. Laws pp. 68–69. And that practice continued even after the States amended their constitutions to include speech protections similar to those in the First Amendment. See, *e.g.,* Fla. Const., Art. I, §5 (1838); Ill. Const., Art. VIII, §22 (1818), Mich. Const., Art. I, §7 (1835); N. J. Const., Art. I, §5 (1844); J. Hood, Index of Colonial and State Laws of New Jersey 1203, 1235, 1257, 1265 (1905); 1 Ill. Stat., ch. 30, div. 9, §31 (3d ed. 1873). State practice thus provides at least some evidence of the original meaning of the phrase "freedom of speech" in the First Amendment. See *Roth* v. *United States*, 354 U. S. 476, 481–483 (1957) (engaging in a similar inquiry with respect to obscenity).

Shortly after the founding, several States and Territo-

ries enacted laws making it a crime to "knowingly send or deliver any letter or writing, with or without a name subscribed thereto, or signed with a fictitious name, . . . threatening to maim, wound, kill or murder any person, or to burn his or her [property], though no money, goods or chattels, or other valuable thing shall be demanded," *e.g.,* 1795 N. J. Laws §57, at 108; see also, *e.g.,* 1816 Ga. Laws p. 178; 1816 Mich. Territory Laws p. 128; 1827 Ill. Crim. Code §108; 1832 Fla. Laws, at 68–69. These laws appear to be the closest early analogue to §875(c), as they penalize transmitting a communication containing a threat without proof of a demand to extort something from the victim. Threat provisions explicitly requiring proof of a specific "intent to extort" appeared alongside these laws, see, *e.g.,* 1795 N. J. Laws §57, at 108, but those provisions are simply the predecessors to §875(b) and §875(d), which likewise expressly contain an intent-to-extort requirement.

The laws without that extortion requirement were copies of a 1754 English threat statute subject to only a general-intent requirement. The statute made it a capital offense to "knowingly send any Letter without any Name subscribed thereto, or signed with a fictitious Name . . . threatening to kill or murder any of his Majesty's Subject or Subjects, or to burn their [property], though no Money or Venison or other valuable Thing shall be demanded." 27 Geo. II, ch. 15, in 7 Eng. Stat. at Large 61 (1754); see also 4 W. Blackstone, Commentaries on the Laws of England 144 (1768) (describing this statute). Early English decisions applying this threat statute indicated that the appropriate mental state was general intent. In *King* v. *Girdwood*, 1 Leach 142, 168 Eng. Rep. 173 (K. B. 1776), for example, the trial court instructed the jurors that, "if they were of opinion that" the "terms of the letter conveyed an actual threat to kill or murder," "and that the prisoner knew the contents of it, they ought to find him

guilty; but that if they thought he did not know the contents, or that the words might import any thing less than to kill or murder, they ought to acquit," *id.,* at 143, 168 Eng. Rep., at 173. On appeal following conviction, the judges "thought that the case had been properly left to the Jury." *Ibid.*, 168 Eng. Rep., at 174. Other cases likewise appeared to consider only the import of the letter's language, not the intent of its sender. See, *e.g., Rex* v. *Boucher*, 4 Car. & P. 562, 563, 172 Eng. Rep. 826, 827 (K. B. 1831) (concluding that an indictment was sufficient because "th[e] letter very plainly conveys a threat to kill and murder" and "[n]o one who received it could have any doubt as to what the writer meant to threaten"); see also 2 E. East, A Treatise of the Pleas of the Crown 1116 (1806) (discussing *Jepson and Springett's Case*, in which the judges disagreed over whether "the letter must be understood as . . . importing a threat" and whether that was "a necessary construction").

Unsurprisingly, these early English cases were well known in the legal world of the 19th century United States. For instance, Nathan Dane's A General Abridgement of American Law—"a necessary adjunct to the library of every American lawyer of distinction," 1 C. Warren, History of the Harvard Law School and of Early Legal Conditions in America 414 (1908)—discussed the English threat statute and summarized decisions such as *Girdwood*. 7 N. Dane, A General Abridgement of American Law 31–32 (1824). And as this Court long ago recognized, "It is doubtless true . . . that where English statutes . . . have been adopted into our own legislation; the known and settled construction of those statutes by courts of law, has been considered as silently incorporated into the acts, or has been received with all the weight of authority." *Pennock* v. *Dialogue*, 2 Pet. 1, 18 (1829); see also, *e.g., Commonwealth* v. *Burdick*, 2 Pa. 163, 164 (1846) (considering English cases persuasive authority in interpreting similar

state statute creating the offense of obtaining property through false pretenses). In short, there is good reason to believe that States bound by their own Constitutions to protect freedom of speech long ago enacted general-intent threat statutes.

Elonis disputes this historical analysis on two grounds, but neither is persuasive. He first points to a treatise stating that the 1754 English statute was "levelled against such whose intention it was, (by writing such letters, either without names or in fictitious names,) to conceal themselves from the knowledge of the party threatened, that they might obtain their object by creating terror in [the victim's] mind." 2 W. Russell & D. Davis, A Treatise on Crimes & Misdemeanors 1845 (1st Am. ed. 1824). But the fact that the ordinary prosecution under this provision involved a defendant who intended to cause fear does not mean that such a mental state was *required* as a matter of law. After all, §875(c) is frequently deployed against people who wanted to cause their victims fear, but that fact does not answer the legal question presented in this case. See, *e.g., United States* v. *Sutcliffe*, 505 F. 3d 944, 952 (CA9 2007); see also Tr. of Oral Arg. 53 (counsel for the Government noting that "I think Congress would well have understood that the majority of these cases probably [involved] people who intended to threaten").

Elonis also cobbles together an assortment of older American authorities to prove his point, but they fail to stand up to close scrutiny. Two of his cases address the offense of breaching the peace, *Ware* v. *Loveridge*, 75 Mich. 488, 490–493, 42 N. W. 997, 998 (1889); *State* v. *Benedict*, 11 Vt. 236, 239 (1839), which is insufficiently similar to the offense criminalized in §875(c) to be of much use. Another involves a prosecution under a blackmailing statute similar to §875(b) and §875(c) in that it expressly required an "intent to extort." *Norris* v. *State*, 95 Ind. 73, 74 (1884). And his treatises do not clearly distinguish

between the offense of making threats with the intent to extort and the offense of sending threatening letters without such a requirement in their discussions of threat statutes, making it difficult to draw strong inferences about the latter category. See 2 J. Bishop, Commentaries on the Criminal Law §1201, p. 664, and nn. 5–6 (1877); 2 J. Bishop, Commentaries on the Law of Criminal Procedure §975, p. 546 (1866); 25 The American and English Encyclopædia of Law 1073 (C. Williams ed. 1894).

Two of Elonis' cases appear to discuss an offense of sending a threatening letter without an intent to extort, but even these fail to make his point. One notes in passing that character evidence is admissible "to prove *guilty knowledge* of the defendant, when that is an essential element of the crime; that is, the *quo animo*, the *intent* or design," and offers as an example that in the context of "sending a threatening letter, . . . prior and subsequent letters to the same person are competent in order to show the intent and meaning of the particular letter in question." *State* v. *Graham*, 121 N. C. 623, 627, 28 S. E. 409, 409 (1897). But it is unclear from that statement whether that court thought an *intent to threaten* was required, especially as the case it cited for this proposition—*Rex* v. *Boucher*, 4 Car. & P. 562, 563, 172 Eng. Rep. 826, 827 (K. B. 1831)—supports a general-intent approach. The other case Elonis cites involves a statutory provision that had been judicially limited to "'pertain to one or the other acts which are denounced by the statute,'" namely, terroristic activities carried out by the Ku Klux Klan. *Commonwealth* v. *Morton*, 140 Ky. 628, 630, 131 S. W. 506, 507 (1910) (quoting *Commonwealth* v. *Patrick*, 127 Ky. 473, 478, 105 S. W. 981, 982 (1907)). That case thus provides scant historical support for Elonis' position.

## B

Elonis also insists that our precedents require a mental

state of intent when it comes to threat prosecutions under §875(c), primarily relying on *Watts*, 394 U. S. 705, and *Virginia* v. *Black*, 538 U. S. 343 (2003). Neither of those decisions, however, addresses whether the First Amendment requires a particular mental state for threat prosecutions.

As Elonis admits, *Watts* expressly declined to address the mental state required under the First Amendment for a "true threat." See 394 U. S., at 707–708. True, the Court in *Watts* noted "grave doubts" about *Raganksy*'s construction of "willfully" in the presidential threats statute. 394 U. S., at 707–708. But "grave doubts" do not make a holding, and that stray statement in *Watts* is entitled to no precedential force. If anything, *Watts* continued the long tradition of focusing on objective criteria in evaluating the mental requirement. See *ibid.*

The Court's fractured opinion in *Black* likewise says little about whether an intent-to-threaten requirement is constitutionally mandated here. *Black* concerned a Virginia cross-burning law that expressly required "'an intent to intimidate a person or group of persons,'" 538 U. S., at 347 (quoting Va. Code Ann. §18.2–423 (1996)), and the Court thus had no occasion to decide whether such an element was necessary in threat provisions silent on the matter. Moreover, the focus of the *Black* decision was on the statutory presumption that "any cross burning [w]as prima facie evidence of intent to intimidate." 538 U. S., at 347–348. A majority of the Court concluded that this presumption failed to distinguish unprotected threats from protected speech because it might allow convictions "based solely on the fact of cross burning itself," including cross burnings in a play or at a political rally. *Id.,* at 365–366 (plurality opinion); *id.,* at 386 (Souter, J., concurring in judgment in part and dissenting in part) ("The provision will thus tend to draw nonthreatening ideological expression within the ambit of the prohibition of intimidating

expression").    The objective standard for threats under
§875(c), however, helps to avoid this problem by "forc[ing]
jurors to examine the circumstances in which a statement
is made." *Jeffries*, 692 F. 3d*,* at 480.

In addition to requiring a departure from our prece-
dents, adopting Elonis' view would make threats one of
the most protected categories of unprotected speech,
thereby sowing tension throughout our First Amendment
doctrine.  We generally have not required a heightened
mental state under the First Amendment for historically
unprotected categories of speech.  For instance, the Court
has indicated that a legislature may constitutionally
prohibit "'fighting words,' those personally abusive epi-
thets which, when addressed to the ordinary citizen, are,
as a matter of common knowledge, inherently likely to
provoke violent reaction," *Cohen* v. *California*, 403 U. S.
15, 20 (1971)—without proof of an intent to provoke a
violent reaction.  Because the definition of "fighting words"
turns on how the "ordinary citizen" would react to the
language, *ibid.*, this Court has observed that a defendant
may be guilty of a breach of the peace if he "makes state-
ments likely to provoke violence and disturbance of good
order, even though no such eventuality be intended," and
that the punishment of such statements "as a criminal act
would raise no question under [the Constitution]," *Cant-
well* v. *Connecticut*, 310 U. S. 296, 309–310 (1940); see
also *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 572–
573 (1942) (rejecting a First Amendment challenge to a
general-intent construction of a state statute punishing
"'fighting' words"); *State* v. *Chaplinsky*, 91 N. H. 310, 318,
18 A. 2d 754, 758 (1941) ("[T]he only intent required for
conviction . . . was an intent to speak the words").  The
Court has similarly held that a defendant may be convicted
of mailing obscenity under the First Amendment with-
out proof that he knew the materials were legally obscene.
*Hamling,* 418 U. S.*,* at 120–124.  And our precedents allow

liability in tort for false statements about private persons on matters of private concern even if the speaker acted negligently with respect to the falsity of those statements. See *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U. S. 767, 770, 773–775 (1986). I see no reason why we should give threats pride of place among unprotected speech.

\*     \*     \*

There is always a risk that a criminal threat statute may be deployed by the Government to suppress legitimate speech. But the proper response to that risk is to adhere to our traditional rule that only a narrow class of true threats, historically unprotected, may be constitutionally proscribed.

The solution is not to abandon a mental-state requirement compelled by text, history, and precedent. Not only does such a decision warp our traditional approach to *mens rea*, it results in an arbitrary distinction between threats and other forms of unprotected speech. Had Elonis mailed obscene materials to his wife and a kindergarten class, he could have been prosecuted irrespective of whether he intended to offend those recipients or recklessly disregarded that possibility. Yet when he threatened to kill his wife and a kindergarten class, his intent to terrify those recipients (or reckless disregard of that risk) suddenly becomes highly relevant. That need not—and should not—be the case.

Nor should it be the case that we cast aside the mental-state requirement compelled by our precedents yet offer nothing in its place. Our job is to decide questions, not create them. Given the majority's ostensible concern for protecting innocent actors, one would have expected it to announce a clear rule—any clear rule. Its failure to do so reveals the fractured foundation upon which today's decision rests.

I respectfully dissent.